Tyrone **GAITHER**, Appellant,

v.

**UNITED STATES** of America, Appellee.

Charles **TATUM**, Appellant,

v.

**UNITED STATES** of America, Appellee.

Nos. 21780, 22148, 21864.

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 14, 1969.

Decided April 8, 1969.

On Rehearing April 24, 1969.

Mr. Robert L. Weinberg, Washington, D. C. (appointed by this court), for appellant in Nos. 21,780 and 22,148.

Mr. Julian P. Freret, Washington, D. C. (appointed by this court), for appellant in No. 21,864.

Mr. Roger E. Zuckerman, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., and Frank Q. Nebeker, Asst. U. S. Atty., were on the brief, for appellee.

Before WRIGHT, McGOWAN and ROBINSON, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

Appellants Tatum and Gaither were convicted of grand larceny for a shoplifting expedition to Woodward & Lothrop's Department Store. The evidence showed that Tatum took five sport coats from a display rack and laid them on the floor. Gaither then approached with a large shopping bag, which he held open while Tatum put the coats inside. A special policeman employed by the store observed the incident, and with the help of two colleagues arrested appellants before they left the store. The coats had a wholesale value of over $100.

Appellants attack their convictions on a host of grounds. Chief among these is a challenge to the indictment proce-

dure used in this case. We find that procedure to be indeed defective, and we require that it be changed for indictments brought after the date of this opinion. However, in the instant case we find no prejudice to appellants requiring reversal. With respect to the other errors claimed, we likewise find no defect affecting substantial rights, and hence we affirm both convictions.

## I

The indictment was returned under what is evidently the normal procedure followed in this jurisdiction. On August 2, 1967, the grand jury met, and an Assistant United States Attorney examined the arresting officer. On the same day, the grand jury voted to "present" the defendants for grand larceny. Their decision is recorded on a printed form which, after being filled in, read as follows:

> "We, the Grand Jurors of the United States of America, in and for the District aforesaid, upon our oaths, do PRESENT Charles Tatum [and] Tyrone Gaither [for] Grand Larceny at the District aforesaid, on the 2nd day of August, A. D. 1967."

The presentment is signed by the foreman of the grand jury.

The grand jury as a body did not consider the case again. An indictment was drafted by the United States Attorney's office, and was signed by the foreman of the jury under the traditional certification "A True Bill." The indictment was returned on August 30, 1967.

▆ Rule 6(f) of the Federal Rules of Criminal Procedure provides: "An indictment may be found only upon the concurrence of 12 or more jurors." And Rule 6(c) emphasizes the requirement that 12 jurors shall "find" each indictment by its provision that the foreman "shall keep a record of the number of jurors concurring in the finding of every indictment * * *." The requirement of the Criminal Rules that every indictment must be "found" by at least 12 grand jurors is a further specification of the Fifth Amendment's command that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury * * *." [1]

A. Appellants contend that the procedure followed failed to meet the standards of Rule 6 and the Fifth Amendment, in that the indictment brought was not an "indictment of a Grand Jury" which had been "found" by the requisite 12 jurors. They raised this contention by timely motion to dismiss the indictment in the District Court,[2] and renewed it

---

1. The meaning of the term "presentment" in the Fifth Amendment is discussed in L. ORFIELD, CRIMINAL PROCEDURE FROM ARREST TO APPEAL 157–158 (1947). Professor Orfield points out that, if a presentment were ever an *alternative* to an indictment, that has not been the case since the adoption of the Federal Rules of Criminal Procedure, which make no provision for prosecuting by presentment.

"Presentments" in the sense of initial accusations by a grand jury, later reduced to an indictment, can still be used as they were in this case. However, as Professor Orfield writes and as we hold in this case, "a presentment must be drawn up into a bill of indictment and resubmitted to the grand jury." L. ORFIELD, *op. cit. supra*, at 157. *And see* cases cited *infra*, Notes 21 and 22.

2. Rule 12(b)(2), FED.R.CRIM.P., provides:

"Defenses and objections based on defects in the institution of the prosecution or in the indictment or information other than that it fails to show jurisdiction in the court or to charge an offense may be raised only by motion before trial. * * *"

Rule 12(b)(3) provides that motions of this type "shall be made before the plea is entered, but the court may permit it to be made within a reasonable time thereafter."

The motion in this case was made after both defendants had entered their pleas, and no formal extension appears to have been granted. However, we have read Rule 12 in this Circuit to allow motions after the plea in all cases, provided they are made within a reasonable time after appointment of counsel. McGill v. United States, 121 U.S.App.D.C. 179, 181–182, 348 F.2d 791, 793–794 (1965).

by motion in arrest of judgment. Both motions were denied.

 Appellants attack the indictment procedure followed here on the basis of the policies inherent in the constitutional guarantee of indictment by grand jury, and in the history underlying that guarantee. The Fifth Amendment guarantees that prosecutions for serious crime may only be instituted by indictment. The indictment as a charging instrument has been recognized to have two chief purposes—first to apprise the accused of the charges against him, so that he may adequately prepare his defense, and second to describe the crime with which he is charged with sufficient specificity to enable him to protect against future jeopardy for the same offense.[3]

 But these are not the only purposes of the indictment provisions of the Fifth Amendment. The Fifth Amendment requires that an indictment be brought by a grand jury. The grand jury is interposed "to afford a safeguard against oppressive actions of the prosecutor or a court."[4] The decision to hale a man into a court is a serious one, subject to official abuse. For this reason, 12 ordinary citizens must agree upon an indictment before a defendant is tried on a felony charge.[5] The con-

tent of the charge, as well as the decision to charge at all, is entirely up to the grand jury—subject to its popular veto, as it were.[6] The grand jury's decision not to indict at all, or not to charge the facts alleged by the prosecutorial officials, is not subject to review by any other body.[7]

 The sweeping powers of the grand jury over the terms of the indictment entail very strict limitations upon the power of prosecutor or court to change the indictment found by the jurors, or to prove at trial facts different from those charged in that indictment. Since the grand jury has unreviewable power to refuse indictment, and to alter a proposed indictment, proof at trial of facts different from those charged cannot generally be justified on the ground that the same facts were before the grand jury and that the jurors might or even should have charged them.

Supreme Court decisions on amendment of the indictment support these principles as necessary inferences from the guarantee of indictment *by a grand jury*. In the leading case of Ex parte Bain, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887), the defendant, an officer of a banking association, was charged with making a false report "with intent to deceive *the Comptroller of the Currency*

---

3. Russell v. United States, 369 U.S. 749, 763–764, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962).

4. United States v. Cox, 5 Cir., 342 F.2d 167, 170, cert. denied, Cox v. Hauberg, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965).

5. *See* Stirone v. United States, 361 U.S. 212, 218, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960):
 "* * * The very purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge. * * *"
 *And see* Wood v. Georgia, 370 U.S. 375, 390, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962):
 "Historically, [the grand jury] has been regarded as a primary security to the innocent against hasty, malicious

and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused * * * to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will. * * *" (Footnote omitted.)

6. "* * * Since it has the power to refuse to indict even where a clear violation of law is shown, the grand jury can reflect the conscience of the community in providing relief where strict application of the law would prove unduly harsh."
 8 J. W. Moore, Federal Practice ¶ 6.02[1] (Cipes ed.1968). (Footnotes omitted.)

7. However, it has been held that the prosecutor may veto the grand jury's decision to indict by refusing to sign the indictment. United States v. Cox, *supra* Note 4.

*and* the agent appointed to examine the affairs of said association." [8] On motion by the Government, the trial court ordered the italicized words struck out as surplusage. The Supreme Court set the conviction aside. In reply to the trial judge's argument "that the grand jury would have found the indictment without this language," the Court stated:

> " * * * But it is not for the court to say whether they would or not. The party can only be tried upon the indictment as found by such grand jury, and especially upon all its language found in the charging part of that instrument. * * * [H]ow can it be said that, with these words stricken out, it is the indictment which was found by the grand jury? If it lies within the province of a court to change the charging part of an indictment to suit its own notions of what it ought to have been, or what the grand jury would probably have made it if their attention had been called to suggested changes, the great importance which the common law attaches to an indictment by a grand jury, as a prerequisite to a prisoner's trial for a crime, and without which the Constitution says 'no person shall be held to answer,' may be frittered away until its value is almost destroyed."

121 U.S. at 9–10, 7 S.Ct. at 786.

The Supreme Court has continued to adhere to the *Bain* principle in recent years. In Stirone v. United States, 361 U.S. 212, 30 S.Ct. 270 (1960), the grand jury charged a violation of the Hobbs Act. It found that the interstate commerce affected was the victim's shipment of sand from various other states to his plant in Pennsylvania. The trial judge allowed the Government to introduce evidence of interstate commerce other than that charged—*i.e.*, the movement of finished steel from the victim's plant outward to other states. The Court set aside the conviction,· holding that the proof at trial of these uncharged facts amounted to an amendment of the indictment with respect to the element of interstate commerce. The Court relied on *Bain*, and quoted extensively from the passage set out above.[9]

In Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038 (1962), the Supreme Court held that a bill of particulars cannot cure a fatally imprecise indictment. The bill of particulars fully serves the functions of apprising the accused of the charges and protecting him against future jeopardy, but it does not preserve his right to be tried on a charge found by a grand jury. The Court again cited the passage from *Bain*,[10] referred to "the settled rule in the federal courts that an indictment may not be amended except by resubmission to the grand jury, unless the change is merely a matter of form," [11] and stated:

> " * * * To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure. For a defendant could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him. * * * "[12]

In *Bain, Stirone* and *Russell* the Supreme Court has shown that it takes seriously, and requires to be enforced rigorously, the Fifth Amendment's command that a defendant to a charge of "infamous crime" be tried only on an "indictment of a Grand Jury." But here, appellants argue, the defend-

---

8. 121 U.S. at 4, 7 S.Ct. at 783. (Italics in original.)

9. 361 U.S. at 216–217, 80 S.Ct. at 273. The Court stated: "The *Bain* case, which has never been disapproved, *stands* for the rule that a court cannot permit a defendant to be tried on charges that are not made in the indictment against him." *Id.* at 217, 80 S.Ct. at 273.

10. 369 U.S. at 770–771, 82 S.Ct. at 1050.

11. *Id.* at 770, 82 S.Ct. at 1050.

12. *Ibid.*

ants were tried on an indictment drawn by an Assistant United States Attorney on the grand jury's instruction ("presentment") [13] that they be charged with grand larceny. Only the foreman saw and approved the actual indictment, which set out the facts thought to constitute the essential elements of the crime. Thus, argue appellants, the indictment was "found," not by the grand jury, but by the prosecutor, operating under the grand jury's bare instruction to indict for grand larceny.

Appellants draw on history to support their argument that the Framers contemplated the grand jury passing on the actual words of the indictment. They note the Supreme Court's statement that "[t]here is every reason to believe that our constitutional grand jury was intended to operate substantially like its English progenitor." [14] And then they point out the practice of English grand juries around the time of the Revolution, as described by Blackstone. According to Blackstone, at common law a bill of indictment was preferred to the grand jury by the Crown, and after hearing witnesses, the grand jury voted that the bill was "a true bill" or "not a true bill." [15]

The Government argues that the indictment procedure followed in this case has been sanctified by tradition as "the American practice," and indeed has been approved by implication by the Supreme Court. Chief reliance is placed upon two cases, Frisbie v. United States, 157 U.S. 160, 15 S.Ct. 586, 39 L.Ed. 657 (1895), and Hale v. Henkel, 201 U.S. 43, 26 S.Ct.

370, 50 L.Ed. 652 (1906), both decided within 15 years after *Bain*.

In *Frisbie* the defendant challenged his indictment as lacking the signature of the foreman and the inscription "a true bill." The Supreme Court affirmed on the ground that this objection had not been timely made. In dictum, the Court acknowledged that absence of these clerical formalities was ground for dismissal at English common law, but indicated that their omission might be harmless under American practice. The Court described the English practice as set out by Blackstone, and noted that the "true bill" and foreman's signature were the only means of certifying the grand jury's approval of the indictment preferred to them by the Crown. The Court went on:

> " * * * But in this country the common practice is for the grand jury to investigate any alleged crime, no matter how or by whom suggested to them, and after determining that the evidence is sufficient to justify putting the party suspected on trial, to direct the preparation of the formal charge or indictment. Thus they return into court only those accusations which they have approved, and the fact that they thus return them into court is evidence of such approval, and the formal indictment loses its essential character. * * * " [16]

This passage, particularly relied on by the Government, contains no intimation that, after the prosecutor prepared the formal indictment, he returned it into court without resubmission to the grand jury for approval.[17] Rather the *Frisbie*

---

13. The "presentment" voted in this case does not satisfy the constitutional requirement of a "presentment or indictment of a Grand Jury," lacking as it does the specificity of an adequate charging document. In any case, the Federal Rules do not contemplate prosecutions based upon a presentment. *See* Note 1, *supra*.

14. Costello v. United States, 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956).

15. 4 W. Blackstone, Commentaries 305*–306* (1854). *But see* Note 17, *infra*.

16. 157 U.S. at 163, 15 S.Ct. at 587.

17. Nor is the practice described peculiarly American. A similar procedure is described by Blackstone under the heading of "Prosecution—By Presentment":

"A present [*sic*], *properly* speaking, is the notice taken by a grand jury of any offense from their own knowledge

case apparently represents an instance of inadvertent omission of the usual notation of ratification, found harmless on the assumption that the indictment had in fact been found by the grand jury.

The Government also cites dictum from Hale v. Henkel, *supra*, that "the authorities in the state courts largely preponderate in favor of the theory that the grand jury may act upon information received by them from the examination of witnesses without a formal indictment, or other charge previously laid before them." 201 U.S. at 62, 26 S.Ct. at 374. The Court further noted that "under the practice in this country, at least, the examination of witnesses need not be preceded by a presentment or indictment formally drawn up." *Id.* at 65, 26 S.Ct. at 375. These passages from *Hale* further clarify the "American practice" described in *Frisbie*.[18] Under that practice, indictment is preceded by a grand jury investigation, at the close of which the grand jury votes to indict. The prosecutor then drafts an indict-

ment. Nothing in the two cases cited approves the further step, essential to the Government's case here, of returning that indictment into court without its ratification by the full grand jury.

Indeed, what authority we have been able to discover indicates that 19th century practice referred to in *Frisbie* and *Hale*, and still used today in connection with grand jury investigations,[19] included submission of the formal indictment to the grand jury for approval after the prosecutor had drafted it in accordance with the grand jury's instruction. Professor Orfield, a leading authority on American criminal procedure, states flatly that this was the practice.[20] He cites the Pennsylvania case of Commonwealth v. Green, 126 Pa. 531, 17 A. 878, 12 Am.St.Rep. 894 (1889), which clearly supports his position.[21] The report of an 1809 federal case, decided by Chief Justice Marshall sitting as a Circuit judge, similarly indicates a practice of resubmission to the grand jury. United States v. Hill, C.C.D.Va., 26 Fed.Cas.

---

or observation, without any bill of indictment laid before them at the suit of the king, as the presentment of a nuisance, a libel, and the like; upon which the officer of the court must afterward frame an indictment, before the party presented can be put to answer it. * * *"

4 W. BLACKSTONE, *op. cit. supra* Note 15, at 301*. (Emphasis in original; footnotes omitted.) Blackstone does not indicate whether or not the grand jury subsequently voted upon the indictment drawn up by the officer of the court.

18. As noted *supra*, Note 17, the same procedure seems to have been followed by grand juries in England; thus the distinction mentioned by the Court in *Frisbie* between "American" and "English" practice seems to have been based upon a misreading of history.

19. Even today the grand jury may investigate, call witnesses, and make a presentment charging a crime. However, the presentment, even if otherwise an adequate charge, cannot serve as an indictment and hence initiate a prosecution under the Federal Rules until approved by a United States Attorney. *See* Rule

7(c), FED.R.CRIM.P.; United States v. Cox, *supra* Note 4. *See also* Notes 1 and 13, *supra*.

20. L. ORFIELD, *op. cit. supra* Note 1, at 157.

21. The statement of facts preceding the judge's opinion in *Green* begins:

"The grand jury made a presentment charging one Lizzie Green with keeping and maintaining a common bawdyhouse. The district attorney, by leave of court, sent before the grand jury a bill of indictment based upon this presentment, and a true bill was returned. * * *"

12 Am.St.Rep. at 895. The judge's opinion further describes the presentment procedure:

" * * * As we understand the practice, the presentment of a grand jury is *ex mero motu*, and is rarely, if ever, presented in technical form. 'Upon such presentment, when proper, the officer employed to prosecute afterwards frames a bill of indictment, which is then sent to the grand jury, and they find it to be a true bill': 2 HAWK.P.C., c. 25, sec. 1; Bouv.Inst. 452. * * *"

*Id.* at 880.

315 (No. 15,364) (1809).[22] Thus the Government's historical argument based on *Frisbie* and *Hale* must be considered unpersuasive.[23]

The Government urges several reasons of policy for approving the practice followed here. First it is argued that the translation of the grand jury's vote to indict for grand larceny into a formal indictment is simply a "clerical procedure" which therefore does not require the grand jury's approval under the principle suggested in *Frisbie*. This contention might have some merit if the jurors had voted on some set of factual charges which made up the substance of an indictment, and the prosecutor had reduced it to final form by improving the punctuation or phrasing. But such is not the case before us.

The grand jury here voted the bare presentment, and nothing more. The presentment on its face shows no more than the grand jury's decision that appellants should be charged with grand larceny. None of the essential substantive elements of an indictment are shown. Neither the elements of the offense nor the date or place of the alleged crime is set out. A mere perusal of the text of this presentment refutes the suggestion that it amounts to anything like a proper indictment which needed only to be processed through "clerical procedures" before being returned into court.

The Government further relies on the presumption of official regularity, arguing that appellants' attack on the indictment procedure somehow presumes bad faith on the part of the United States Attorney's office. But appellants make no claim that the Government attorneys who draft indictments under this procedure are deliberately perverting the grand jury's will. Their point is rather that the prosecutor can know that will only by guesswork from the evidence he has presented to the jurors. He cannot know the actual tenor of their deliberations or

---

**22.** The report in *Hill* begins as follows:
"On the 13th day of December, 1808, the grand jury presented John K. Hill and others, in this court, for a violation of the embargo laws of the United States * * *. On the following day, the attorney for the United States sent to the grand jury a bill of indictment, founded upon the said presentment, which they found 'A true bill.' * * *"

26 Fed.Cas. at 316.

**23.** The Government relies further upon two state cases, cited by the Court in *Frisbie*, to support its version of the "American practice." Commonwealth v. Smyth, 65 Mass. (11 Cush.) 473 (1853); State v. Magrath, 44 N.J.L. 227 (1882). Both cases describe a procedure in which formal bills are never drawn up beforehand and presented for adoption or rejection by the grand jury, "but, to the contrary, they are drawn subsequently to the investigation, and consequently there are no bills in this course of law which are marked 'not found.'" State v. Magrath, *supra*, at 229. Neither of these cases supports the proposition that the indictments were not submitted to the grand jury for approval; it may have been that in practice the grand jury never disapproved the wording of the indictments as drawn up by the prosecutor.

Counsel for appellants have suggested that the practice in this jurisdiction of not submitting indictments to the grand jury may date back to a Maryland statute of 1722, as described in United States v. Elliott, Cr.Ct. D.C., 25 Fed.Cas. 1003 (No. 15,045) (1845):
" * * * The act of Maryland, passed November 3, 1722, c. 4, provides that from and after the publication hereof no attorney general, or clerk of the peace, or of indictments, shall exhibit any bill or bills of indictment to any grand jury against any person whatsoever * * * [unless] the grand jury find or make a presentment of the offence of their own knowledge * * *. Under this law, a practice has grown up to precede indictments by presentment. This I understand to be the uniform practice at this day * * *. * * *"

The statute was apparently intended to protect the accused from having his case prejudiced by having unauthorized persons come before the grand jury with predrafted indictments. It allowed indictments to come before the grand jury by court order, or after the grand jury had made a presentment. Thus it did not even implicitly authorize return of an indictment into court without the approval of the grand jury.

decisions, for Rule 6(d), FED.R.CRIM.P., provides that "no person other than the jurors may be present while the grand jury is deliberating or voting."

Finally, it is argued that the foreman of the grand jury was present during the deliberations, and that his signature sufficiently attests that the indictment accurately reflects the jury's intent. This argument has some force. We must indulge the assumption that the foreman faithfully reviews the indictment with his best recollection of the grand jury's deliberations in mind. However, those deliberations, conducted only with a view to charging the accused with a statutory category of offense, might not have sufficiently clarified the grand jury's intent. Without an indictment before them, the jurors might not have focused upon each particular element and determined which particular facts should be included in the ultimate accusation. Certainly the jurors' bare decision that appellants should be indicted for grand larceny does not entail that 12 of them did agree, or indeed could have agreed, to a particular indictment for that offense.[24] Thus in our view the signature of the foreman cannot in itself convert the indictment, admittedly not seen by the full grand jury, into one properly found by 12 jurors as required by Rule 6.

We conclude then that Rule 6 requires the grand jury as a body to pass on the actual terms of an indictment. We are impelled to this conclusion largely by the constitutional principles of *Bain*, *Stirone* and *Russell*, which emphasize the right of the accused to be tried on an indictment which has in each material particular been approved by a grand jury. Thus it follows that the bringing of an indictment under the procedure followed in this case was error. It remains to discuss the question of prejudice flowing from the procedural error committed.

B. The courts have recognized two kinds of erroneous departure from the original indictment of a grand jury, each with its own standards governing prejudice. An *amendment* of the indictment occurs when the charging terms of the indictment are altered, either literally [25] or in effect,[26] by prosecutor or court after the grand jury has last passed upon them. A *variance* occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment.[27]

An amendment is thought to be bad because it deprives the defendant of his right to be tried upon the charge in the indictment as found by the grand jury and hence subjected to its popular

---

24. A hypothetical example may clarify our meaning here. Suppose the prosecutor charged that the defendant stole five articles with a total value of over $100. Six grand jurors might believe that the evidence only supports a charge that he stole three of the articles, while the same six concluded that these three articles had a value of over $100. The six would vote to indict for grand larceny on these premises. Another six grand jurors might not agree that these three articles were worth $100, and yet conclude that the evidence supported a charge that the defendant took all five articles, whose value they believed aggregated over $100. Thus 12 jurors might agree that the defendant should be tried for grand larceny, while no 12 of them could agree on a particular indictment for that crime. If the jurors only voted on a bare presentment for grand larceny, as in this case, their disagreement would not appear. If the indictment were subsequently drawn according to the particular theory which the foreman happened to hold, or which he believed the jury as a whole held, he would sign it, even though in fact only six jurors would have agreed to that indictment.

25. As in Ex parte Bain, 121 U.S. 1, 7 S. Ct. 781, 30 L.Ed. 849 (1887).

26. As in Stirone v. United States, *supra* Note 5.

27. 1 L. ORFIELD, CRIMINAL PROCEDURE UNDER THE FEDERAL RULES § 7:63 (1966).

scrutiny.[28] A variance is thought to be bad because it may deprive the defendant of notice of the details of the charge against him and protection against reprosecution.[29]

 Because the leading amendment case of Ex parte *Bain* rested explicitly upon the Constitution, and because it apparently excludes any notion of a non-prejudicial amendment to the indictment, the concept of harmless error has not been applied to amendments. However, the strictness of this rule, perhaps inconsistent with present notions of efficient administration of justice, has been avoided by a simple expedient. Rather than amend the terms of an indictment, a prosecutor simply proves the facts which the amended indictment would have charged. Thus instead of an amendment, there is a variance. And the accepted rule is that a variance does not call for dismissal of the indictment except upon a showing of prejudice.[30]

The *Stirone* case limited the use of this device. In that case, there was no actual amendment of the indictment—rather there was a variation in proof from the grand jury's charge. However, the Supreme Court found the variance substantial enough to amount to a constructive amendment of the indictment, and relied on *Bain* in ordering the indictment dismissed. The reason given was not that the variance deprived the defendant of notice or protection against double jeopardy, but rather that it infringed his "right to have the grand jury make the charge on its own judgment." [31]

The sort of error we have in this case is of the "amendment" type. There is no claim that appellants have been deprived of proper notice or have been left unprotected against reprosecution. Rather the procedure used did not assure that "the grand jury [made] the charge on its own judgment."

This case does differ in some ways from the typical amendment of an indictment. In the typical amendment case, it is clear that the defendant is tried on a charge different from that approved by the grand jury. Here there *is* no indictment clearly approved from which deviation can be seen. However, the procedure used here does provide some safeguards against departure from the grand jury's will. The same prosecutor's office which drew the indictment had earlier presented the evidence to the grand jury. More important, the grand jury foreman, who took part in the jurors' deliberations, signed the indictment. These procedures do not come up to what we have held to be the requirement of the Federal Rules—that 12 jurors approve the actual indictment. But they do operate to raise some presumption that the indictment as brought would have been approved by the grand jury had the jurors been given the chance to see it.

For this reason, and because of the serious adverse effect upon the administration of justice in the District of Columbia of dismissal of numerous pending indictments, we conclude that the erroneous procedure followed in this case should not automatically lead to dismissal of the indictment.[32] Rather the follow-

28. Stirone v. United States, *supra* Note 5, 361 U.S. at 216–218, 80 S.Ct. 270, 4 L. Ed.2d 252.

29. Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

30. *Ibid.*

31. 361 U.S. at 218–219, 80 S.Ct. at 274, 4 L.Ed.2d 252.

32. The invalidity of the indictment procedure would not normally affect indictments in cases which have already gone to trial, except where the particular objection urged here had also been urged by

pretrial motion. Procedural challenges to the indictment must be raised by motion before trial. Rule 12(b)(2), Fed.R.Crim. P.; Jackson v. United States, 123 U.S. App.D.C. 276, 280 n. 3, 359 F.2d 260, 264 n. 3 (1965), *cert. denied*, 385 U.S. 877, 87 S.Ct. 157, 17 L.Ed.2d 104 (1966).

However, pretrial challenges to the defect found here can be made in cases now pending trial. On June 30, 1968, there were 1,374 such cases pending in the District Court. 1968 ANNUAL REPORT OF THE DIRECTOR OF THE ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS 122. To require that all indictments in

ing standard will be applied, and the following procedures should be used in cases involving pending indictments challenged on the same grounds.

Upon a defendant's motion to dismiss the indictment because only the foreman had ratified it, the foreman's signature should raise a presumption that the indictment reflects the will of the grand jury. In order to attack that presumption, the defense should have access to the grand jury minutes.[33] If on the basis of those minutes and the presentment voted by the grand jury the defense can show a reasonable possibility that the jurors would not have approved of the indictment actually returned to court, but would have insisted on an indictment different in some material respect, the indictment should be dismissed.[34] In determining whether the actual indictment departed from the will of the grand jury, the court should be guided by the principles laid down by the Supreme Court in *Stirone*.[35]

This statement of the standard may be somewhat clarified by our application of it to the facts of this case in Section C,

*infra.* However, it will remain a troublesome test to apply in actual litigation, requiring as it does guesswork concerning what the grand jury *might* not have approved. Such guesswork is difficult to carry out, and has been criticized on the further ground that it invades the very purpose of the grand jury, which is to provide a lay check upon the criminal process.[36] However, the alternative to permitting such guesswork is to bring about dismissal of at least all pending indictments brought under this defective procedure. Because of these considerations of criminal law administration, which we may properly consider under existing Supreme Court precedents,[37] we have not applied the principle forbidding judicial conjecture about the hypothetical acts of grand jurors in its full rigor.

The same considerations of efficient administration of justice do not apply to indictments to be brought in the future. Henceforth the United States Attorney is on notice that the indictment procedure followed in this case is defec-

---

pending cases be dismissed and the defendants re-indicted would work a major dislocation in the administration of justice in this jurisdiction. We may appropriately take account of this factor in determining the retroactive application of our decision here. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); Tehan v. U. S. ex rel. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966); Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). *Cf.* Allen v. State Board of Elections, 393 U.S. 544, 572, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). In departing from the strict rule that amendments of the indictment call for dismissal, not for guesswork into the minds of the jurors (*see* Note 36 *infra*), we are taking account of these practical considerations.

33. Of course, the Government may have objections to disclosing grand jury minutes which would not otherwise be available to the defense under Allen v. United States, 129 U.S.App.D.C. 61, 390 F.2d 476 (1968). In such cases it will have

to choose between such disclosure and re-indictment of the defendant.

34. The "reasonable possibility" standard is based upon Jackson v. United States, *supra* Note 32, 123 U.S.App.D.C. at 280, 359 F.2d at 264. *And compare* Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

35. "And the addition charging interference with steel exports here is neither trivial, useless, nor innocuous." 361 U.S. at 217, 80 S.Ct. at 273, 4 L.Ed.2d 252. *And compare* this court's formulation in Jackson v. United States, *supra* Note 32, 123 U.S. App.D.C. at 280, 359 F.2d at 264.

36. " * * * To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of the basic protection which the guaranty of the intervention of a grand jury was designed to secure. * * * " Russell v. United States, *supra* Note 3, 369 U.S. at 770, 82 S.Ct. at 1050, 8 L. Ed.2d 240. *And see* Note 5, *supra.*

37. *See* Note 32, *supra.*

tive.[38] Because the test for prejudice is cumbersome and difficult to apply and, more important, because the application of it involves the kind of guesswork which the Supreme Court has disapproved, a flat rule requiring dismissal of indictments not found by 12 grand jurors will be appropriate in the case of indictments returned after the date of this decision.[39]

C. Though in the normal case the inquiry into prejudice outlined in Section B, *supra,* should be made in the first instance by the District Court, in this case we have before us the grand jury transcript and the arguments of counsel on the question of prejudice, and we find that a remand is unnecessary. The grand jury minutes consist of the testimony of the arresting officer, a special policeman employed by Woodward & Lothrop's Department Store.

In the course of the brief proceedings, the officer testified to the facts of the shoplifting episode roughly as set out at the beginning of this opinion. He further gave the date and time of the crime, and some of the details of the arrest. He testified that he had seen the defendants stealing clothes three days before the crime in question, but had been unable to catch them. Finally he testified that the five sport coats had a total retail value of $265.

As described above, the grand jury voted, without further detail, to present the two named defendants for grand larceny. The subsequent indictment, drawn up by the United States Attorney's office and signed by the grand jury foreman, reads as follows:

"On or about July 7, 1967, within the District of Columbia, Charles Tatum and Tyrone Gaither stole property of Woodward & Lothrop, Washington, D. C., a body corporate, of the value of about $131.00, consisting of five men's sport jackets of the value of about $131.00."

Appellants argue, first, that the grand jury transcript reveals evidence of *two* larcenies—the one for which appellants were arrested, and the other observed by the same officer three days before. So far as we know from the transcript and the presentment, appellants urge, the grand jury may have intended to indict for the earlier crime and not for the later.

We have no hesitation in rejecting this conjecture as wholly improbable. The examination of the arresting officer before the grand jury was directed almost exclusively at the later of the two shoplifting incidents. The earlier incident was referred to in passing, near the end of the examination, apparently for the purpose of further supporting the officer's identification of the appellants as the shoplifters. There is no substantial possibility that the grand jury meant to charge appellants with the earlier and not with the later crime.

Appellants argue, second, that the element of value in the indictment differs from what the grand jury would probably have charged on the basis of the evidence before them. Before the grand jury, the arresting officer testified that the five coats had a retail value of $265. The indictment names a value of $131. As testimony at trial makes clear, the latter figure represents the wholesale value of the coats.

Since the figure of $265 was the only evidence of value placed before the grand jury, the jurors, operating under a strict conception of their duty, might have refused to ratify an indictment giving a

---

38. Indeed, it has been clear since the adoption of the Federal Rules of Criminal Procedure that a presentment is not a sufficient substitute for an indictment found by 12 grand jurors. *See* Note 1, *supra.*

39. The "flat rule" is the normal one for errors of the "amendment" type. *See* text following Note 31, *supra.* We have, in the interest of efficient administration of justice, made an exception to this "flat rule" in cases of indictments brought before the date of this decision. *See* Note 32, *supra.* Without these considerations, the principles of *Bain, Stirone* and *Russell* would require the "flat rule."

different figure. In such circumstances, if offered no further testimony of value, they might have insisted that appellants be charged with the theft of coats worth $265. In determining whether the fact that the actual indictment charged a lower figure requires dismissal of the indictment, we must inquire whether the lower figure constituted a fatal amendment of the higher figure actually presented to the grand jury.

In our view, it did not. The only possible prejudice from such a variance would arise from the conjecture that the grand jury, while willing to indict for grand larceny on a showing of retail value of $265, might not do so on a showing of wholesale value of $131.

Grand larceny is defined as larceny of property worth $100 or more. As elsewhere in the law, where "value" is not defined it is construed to mean "fair market value." [40] However, it is not a settled matter of law in this jurisdiction whether the relevant market for goods on display in a store is the wholesale or the retail market.[41] While retail price would seem the most reasonable measure of the value of such goods—ready for retail sale as they are—nothing would prevent the grand jury from using the wholesale value in an indictment for grand larceny where, as here, that value exceeds the statutory amount.

If out of an excess of caution the prosecuting attorney had given the grand jury further testimony establishing the wholesale value of the coats as well as their retail value, and had proposed an indictment in terms of the wholesale value, we can see no reasonable possibility that the grand jury would have turn-

ed him down. Of course, it is impossible to prove with perfect certainty that they would not have, but as this court has ruled in a similar situation:

> " * * * Whether there is a reasonable possibility of prejudice, however, should be determined with some reference to the real world of juries and grand juries, and the realm of common sense which must guide the administration of the criminal law and the rules of criminal procedure. * * * " [42]

No other reasonable claim of prejudice having been made, the indictment must stand.

## II

After appellants were arrested, the arresting officer swore out a complaint against them before a deputy clerk of the District of Columbia Court of General Sessions. That complaint served as the procedural basis upon which appellants' preliminary hearing was conducted. Appellants point out that Rule 3, FED.R. CRIM.P., requires that a complaint "shall be made on oath before a commissioner or other oficer empowered to commit persons charged with offenses against the United States." Appellants note that a deputy clerk is not authorized by Rule 3 to administer the oath upon which a complaint is based,[43] and hence urge that the complaint is defective. They argue that the proper remedy is to dismiss the indictment or, in the alternative, to require a second preliminary hearing for appellants to be conducted on the basis of a complaint sworn before an authorized officer.[44]

---

40. *See* 52A C.J.S. Larceny § 60(2)(a) (1968) ; *cf.* Owens v. United States, 115 U.S.App.D.C. 233, 318 F.2d 204 (1963).

41. The conflicting views in the few jurisdictions to pass on the question are set out in 52A C.J.S. Larceny § 60(2)(a), pp. 489–490 n. 47.

42. Jackson v. United States, *supra* Note 32, 123 U.S.App.D.C. at 280, 359 F.2d at 264.

43. The "officer[s] empowered to commit" referred to in Rule 3 are set out in 18 U.S.C. § 3041 (1964). They include federal judges, United States commissioners and state and local judges and magistrates, but not clerks or deputy clerks of federal courts.

44. For a discussion of remedies for pre-indictment defects, *see* Blue v. United States, 119 U.S.App.D.C. 315, 320–322, · 342 F.2d 894, 899–901 (1964), cert. de-

■ The principal function of a complaint "is as a basis for an application for an arrest warrant."[45] The sworn complaint enables the magistrate to determine whether or not probable cause exists to issue a warrant of arrest. Because pre-arrest complaints are thus designed to play an important role in the protection of Fourth Amendment rights, they must be sworn before a judicial officer.

■ Where an arrest is made without a warrant, and the complaint is therefore sworn after the arrest, it serves no such important function; "since the complaint at that stage [*i. e.* post-arrest] serves no practical purpose, its preparation and filing is usually a matter of pro forma routine."[46] Rule 3 does not by its terms allow post-arrest complaints to be sworn before other than judicial officers. Thus we must take it that the rule was not literally complied with by the procedure followed here. However, the minimal function of the complaint as filed after arrest leaves us unable to discern any prejudice to appellants from this procedure. The case would, of course, be very different if a pre-arrest complaint, upon which an arrest warrant was to be based, was not sworn in accordance with the requirements of Rule 3.

### III

Appellant Gaither challenged his arrest as not based upon probable cause, and sought suppression of the five sport coats as fruits of the assertedly illegal arrest. A hearing was held on the motion to suppress, and the motion was denied.

At the hearing the arresting officer, Leonard Peace, testified that he had seen appellant Tatum take the coats from a display rack and place them on the floor, and that appellant Gaither had then aproached with a large shopping bag, into which the two men stuffed the coats. Officer Peace called another officer, George Krauss, when he recognized Gaither and Tatum, and Officer Krauss arrived in time to see Tatum with the coats at his feet and to see Gaither approach with the bag. Peace testified that he had an unobstructed view of the events. Krauss on the other hand testified that his view of the two men stuffing the coats into the bag was obstructed by another clothing rack, so that he could only see the coats coming up off the floor and the moving shoulders of Tatum and Gaither. Peace, aided by a third officer, made the arrest. On the basis of this testimony, the court denied the motion to suppress.

At trial, both officers testified again, largely to the same effect. Both testified that they stood close together while they viewed the place where Tatum and Gaither placed the coats in the bag. Peace again testified that he had an unobstructed view, while Krauss testified that a rack obstructed his view during part of the theft, though not sufficiently to disable him from identifying appellants and determining what they were doing. Another employee of the store testified that during the month of the theft a low table stood in front of the sport coat rack which might have blocked the view of part of the floor under that rack to viewers standing where Peace and Krauss were. This employee was not in the store on the day of the robbery.

At the close of the trial appellant Gaither reasserted his motion to suppress the coats as the fruits of an illegal arrest. The court denied the motion, and in response to Gaither's request for findings of fact stated that "[t]he record is replete with probable cause * * *."

■ Whether the judge believed Peace's version of what he saw, or believed Krauss' slightly different version of what was visible to the two officers,

---

nied, 380 U.S. 944, 85 S.Ct. 1029, 13 L. Ed.2d 964 (1965).

45. 8 J. W. MOORE, *op. cit. supra* Note 8, ¶ 3.02[1].

46. *Id.* at ¶ 3.02[2].

he was justified in concluding that Peace had probable cause to arrest Gaither. Rule 41, FED.R. CRIM.P., does not require that the judge on a motion to suppress make formal findings of fact, and especially here, where either of the two slightly conflicting versions of the arrest gave probable cause, it was well within the court's discretion to refuse to make such findings.

■ Appellant Gaither further argues that Officer Peace, a special officer commissioned under 4 D.C.CODE § 115,[47] had no powers of arrest beyond those possessed by a private citizen, and hence was without authority to arrest for a misdemeanor committed in his presence unless that misdemeanor amounted to a breach of the peace.[48] Of course, Gaither was tried for and convicted of grand larceny, a felony,[49] but he points to Officer Peace's testimony that prior to arresting Gaither he had not formed any conclusion whether the value of the coats taken exceeded $100 and hence brought the theft above the misdemeanor offense of petty larceny.

■ We do not believe that any such rapid-fire calculation is necessary to justify a citizen in arresting a shoplifter. Officer Peace saw the men take at least three sport coats. From general knowledge, and particularly as an employee of the store, he must have known that such coats would cost above $35 apiece. Thus he certainly would have concluded, had he stopped to make the calculation, that Gaither was stealing more than $100

worth of merchandise. Thus we need not reach the question of the arrest powers of a special policeman commissioned under 4 D.C.CODE § 115.

## IV

At the close of the direct examination of Officer Peace, appellant Gaither moved for production of the officer's grand jury testimony. The Government responded that it was willing to produce the minutes, but that they might not be readily available. The court ruled that, if the minutes were not available by the next day, the trial would have to proceed. The court told defense counsel that, where possible, it was better as a practical matter to move before trial for production of grand jury testimony. Defense counsel replied that he had read the Supreme Court's *Dennis*[50] decision to preclude a motion for grand jury minutes until after the trial testimony of the witness in question.[51]

The next day the prosecutor represented that the reporter who had recorded the grand jury testimony had been working on another proceeding the previous night, and was leaving town that day, so that a typescript of the minutes could not be made available. The following colloquy ensued:

THE COURT: Mr. Weinberg, I suppose under the circumstances that we will have to proceed without making that testimony available to you. I might suggest that if in the future in other cases you may be trying it might

---

47. 4 D.C.Code § 115 (1967) provides:
"The Commissioners of the District of Columbia, on application of any corporation or individual, or in their own discretion, may appoint special policemen for duty in connection with the property of, or under the charge of, such corporation or individual; said special policemen to be paid wholly by the corporation or person on whose account their appointments are made, and to be subject to such general regulations as the said commissioners may prescribe.'"

48. Singleton v. United States, D.C.App., 225 A.2d 315 (1967); RESTATEMENT (SECOND) OF TORTS § 119 (1965).

49. A private citizen may arrest for a felony committed in his presence. Shettel v. United States, 72 App.D.C. 250, 251, 113 F.2d 34, 35 (1940).

50. Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966).

51. In Allen v. United States, 129 U.S.App. D.C. 61, 67 n. 16, 390 F.2d 476, 482 n. 16 (1968), we indicated that grand jury minutes should in most circumstances be available through a pre-trial motion. The trial in this case was held before *Allen* was decided.

be well to obviate this particular point which is procedure [*sic*] in nature by speaking to Government counsel and giving a little more notice as to your desire for the transcript.

MR. WEINBERG: Your Honor, I made the application at the time that I thought was timely under the Supreme Court's decision in Dennis, but I had informally advised Government counsel before the trial started.

What I would suggest is this. If there is an acquittal, of course the problem is moot. If there should by any chance be a conviction, I suggest that it might be worthwhile having the grand jury testimony transcribed and made available and Your Honor could consider whether it afforded any basis for new trial.

THE COURT: All right, sir. * *

Appellant Gaither, of course, was convicted, and did move for a new trial, asking the court to have transcribed and to peruse the grand jury minutes before deciding that motion. The court did not have the grand jury minutes transcribed, ruling instead that the case was not a close one, so that any minor inconsistencies which might have appeared in Officer Peace's grand jury testimony would not make the denial of the minutes error requiring a new trial.

The trial judge has broad discretion in ruling on a motion for a new trial, both in his actual decision and in what he considers before making that decision. The judge here was within that discretion in deciding that the case was not close to requiring a new trial, so that possible prior inconsistent statements of a Government witness, which might tip the balance in a closer case, could not do so here.

We note that appellant Gaither's able and forceful counsel did not ultimately object to the trial judge's disposition of

his motion to produce the grand jury transcript during trial. That same counsel on appeal does not challenge the trial ruling as error, but rather appeals from the court's refusal to consider the grand jury minutes on the motion for a new trial. Hence we need not rule whether it was error to make disclosure of the minutes during trial conditional on the availability of the reporter to provide them overnight. In general, of course, the right to grand jury transcript is not contingent on the convenience of court reporters.[52] We do have before us the grand jury testimony in question, and having perused it we are satisfied that it reveals nothing which would require the grant of a new trial.

## V

In his opening statement, the prosecutor told the jury that Officer Peace would testify that when he arrested Gaither the latter had on his person neither money nor sales slips for the sport coats. In the course of his examination of Officer Peace, the prosecutor evidently forgot to ask the questions which would have elicited this testimony. (Officer Peace had testified to this effect at the suppression hearing.) In his summation, the prosecutor then made the following erroneous statement:

> "He [Peace] also testified, ladies and gentlemen, that he arrested, searched the defendant Gaither and found no sales slip and found no money."

Defense counsel promptly objected that there was no such testimony in the record. The court then admonished the jury that it was for them to determine what was in evidence, and that if they did not recollect any testimony to that effect they should disregard the prosecutor's statement. In his summation, defense counsel vigorously contested the prosecutor's version of Officer Peace's

---

52. " * * * In our adversary system for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant fact. Exceptions to this are justifiable only by the clearest and most compelling considerations. * * * " Dennis v. United States, *supra* Note 50, 384 U.S. at 873, 86 S.Ct. at 1851. (Footnote omitted.)

testimony, and urged the jurors to have that testimony read back if they had any doubt on the question.

■ The federal courts generally, and this court in particular, have strictly enforced the obligation of the prosecutor to avoid making statements of fact to the jury not supported by proper evidence introduced during trial. This rigor is based on the Supreme Court's observations in Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L. Ed. 1314 (1935), that the interest of the Government in a criminal prosecution "is not that it shall win a case, but that justice shall be done," and that "the average jury * * * has confidence that these obligations [of fairness and accuracy] * * * will be faithfully observed."

■ We have found error in prosecutorial misstatements even where, as here, they were apparently made in good faith.[53] We have not regarded the standard judicial caution that the jury's recollection controls as a cure-all for such errors.[54] We have noticed such errors where they were not objected to at trial, or even on appeal.[55] Thus here, where timely objection was made and pressed on appeal, we must carefully examine the error committed to determine whether it sufficiently prejudiced appellants to call for reversal.

The applicable test for prejudice is whether we can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error."[56] The decisive factors are the closeness of the case,[57] the centrality of the issue affected by the error,[58] and the steps taken to mitigate the effects of the error.[59]

■ In our view, the case was not particularly close. Two eyewitnesses saw appellants take the coats, conceal them, and head for the exit. Appellants were caught red-handed with the goods. There were only relatively minor inconsistencies in the testimony of the two witnesses. The defense consisted largely of testimony by a friend of Tatum's that Tatum had placed the coats on a nearby counter with apparent intent to call them to the friend's attention.[60] Neither appellant took the stand.

If the jury had believed the friend rather than the two officer eyewitnesses, it might well have acquitted. However, the matter on which the prosecutor's erroneous factual statement was made did not concern the events at the coat rack. It rather indicated facts tending to show Gaither's intent with respect to the coats in his possession when he was arrested. Gaither's lack of money was at best tangentially related to that intent; it tended slightly to undermine further the already unlikely hypothesis that he had placed the coats in the bag and headed toward the escalator with the intent of purchasing them. If Gaither had had sales slips for the coats, of course, that

53. As in Corley v. United States, 124 U.S. App.D.C. 351, 365 F.2d 884 (1966). *And see* King v. United States, 125 U.S. App.D.C. 318, 330, 372 F.2d 383, 395 (1967).

54. King v. United States, *supra* Note 53, 125 U.S.App.D.C. at 331, 372 F.2d at 396.

55. Corley v. United States, *supra* Note 53; Stewart v. United States, 101 U.S.App. D.C. 51, 247 F.2d 42 (1957).

56. Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).

57. Cross v. United States, 122 U.S.App. D.C. 283, 285, 353 F.2d 454, 456 (1965);

Jones v. United States, 119 U.S.App.D.C. 213, 214 n. 3, 338 F.2d 553, 554 n. 3 (1964).

58. King v. United States, *supra* Note 53, 125 U.SApp.D.C. at 330, 372 F.2d at 395 ("nerve center issue").

59. Cross v. United States, *supra* Note 57, 122 U.S.App.D.C. at 285, 353 F.2d at 456.

60. There was the further testimony indicating that during the month of the theft a low table had obstructed the view of part of the floor near the coat display rack.

would have amounted to virtually conclusive evidence for the defense. Of course, if such evidence had existed, it can hardly be imagined that the defense would not have introduced it. Therefore, the prosecutor's statement that no such slips were found added nothing to the Government's case beyond what the jury must already have inferred.

Finally, any small prejudice which might have accrued from the prosecutor's misstatement was largely countered by the steps taken. Objection was promptly made, thus fixing the statement in the jury's mind as one subject to doubt. The judge cautioned the jury that its recollection should control. Most important, in his own summation defense counsel vigorously contested the prosecutor's misstatement, and invited the jury to have the relevant testimony read back if they had any doubts. Under all these circumstances, we find the prosecutor's misstatement to have been harmless error.

### VI

Appellant Tatum, who was released on his personal recognizance, did not show up at court on the last day of trial. The court had clearly instructed both defendants to be present that day at 9:30 A.M. The court's particularly clear and explicit warning had been elicited by the tardiness of both defendants on the previous day.

After a delay of one half hour, the court determined to proceed. Counsel for Tatum acquiesced in this decision. Arguments and instructions were then taken. After luncheon recess, at 1:50 P.M., the jury returned with a verdict. With appellant Tatum still absent, the court decided to receive the verdict.

Upon receipt of the guilty verdict, the court issued a bench warrant for Tatum's arrest. Tatum was finally arrested nearly three weeks later. A week after that the trial judge issued an order finding that Tatum had "voluntarily absented himself from the last two days of his trial" and ordering him committed to jail to await further proceedings.

Rule 43, FED.R.CRIM.P., requires the presence of defendants at all proceedings against them, except that:

"* * * In prosecutions for offenses not punishable by death, the defendant's voluntary absence after the trial has been commenced in his presence shall not prevent continuing the trial to and including the return of the verdict. * * * "

The provision has the obvious purpose of preventing defendants from defeating trials in progress by departure or flight.

We have since the trial in this case construed Rule 43 to mean

"that if a defendant at liberty remains away during his trial the court may proceed provided it is clearly established that his absence is voluntary. He must be aware of the processes taking place, of his right and of his obligation to be present, and he must have no sound reason for remaining away. * * * "

Cureton v. United States, 130 U.S.App. D.C. 22, 27, 396 F.2d 671, 676 (1968). In *Cureton*, the defendant did not show up on Monday morning. The previous Friday the judge had told the jurors to be present on Monday, but had not directly addressed the defendant. The defendant's counsel objected to proceeding *in absentia* on Monday. In those circumstances, we remanded to determine whether his absence was "clearly voluntary," indicating that the circumstances under which he was taken into custody after the trial would be a relevant consideration.

Here, under somewhat different circumstances, we are able to conclude with fair certainty that Tatum voluntarily absented himself on the last day of his trial. First, he had been late the day before, and the judge had warned him in the sternest and most explicit terms to be present the next morning or face revocation of bail. Second, his counsel did not object to continuation of the trial, thus giving at least some indication that counsel regarded Tatum's absence as voluntary. Third, Tatum was not taken

into custody until January 9, nearly three weeks after the end of his trial. This renders it most unlikely that his absence was the result of simple inadvertence, temporary illness, or other involuntary reason. Finally, no explanation of Tatum's absence from trial has ever been tendered, either into the record by his able trial counsel, or by his appellate counsel in response to questions from the bench on this appeal. In all these circumstances, we think a remand could only confirm what already amply appears—that Tatum voluntarily absented himself from trial.

 Tatum was sentenced before this court's *Cureton* decision had appeared, so that the sentencing judge was not able to take into account our suggestion that a defendant be asked on the record at sentencing whether his absence from trial was voluntary.[61] We reiterate that suggestion now. Where some question of involuntary absence arises at sentencing, a record and a determination can and should be made at that point.

No other substantial contentions of error [62] appearing from the exceptionally able and exhaustive written and oral arguments made in this simple shoplifting case, appellants' convictions must be

Affirmed.

## On Petitions for Rehearing

PER CURIAM:

In our opinion in chief in this case, issued April 8, 1969, we held that the indictment procedure long followed in this jurisdiction violated Rule 6, FED.R. CRIM.P., in that it did not include approval of the indictment by the requisite 12 grand jurors. We announced that all indictments brought under that procedure after the date of our decision would be subject to dismissal, without any inquiry whether the grand jury would have approved the indictment had it been given the chance.

In its briefs and arguments, the Government did not urge any limitation on the retroactive effect of our decision, should we find that the challenged procedure was indeed defective. Nor did it present to us facts concerning the consequences of such a decision on the administration of justice in this jurisdiction, should it be given normal precedential effect. Nevertheless we determined that under Rule 12, FED.R.CRIM. P., many persons indicted but not yet tried could achieve automatic dismissal of their indictments if the decision were made fully retroactive. It appeared to us that this would work a major dislocation in the administration of justice in our already overloaded District Court.

At the same time, it seemed to us that "[s]ound policies of decision making," Stovall v. Denno, 388 U.S. 293, 301, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), compelled us to apply our holding at least in part to the litigants before us. And there appeared to us to be injustice in the application of the holding to Gaither and Tatum, while withholding it from other persons indicted under the same illegal procedure, who still had available to them timely motions to dismiss their indictments. The allowance of such injustice in case of need is amply authorized by Supreme Court precedent,[1] but it seemed to us better avoided if another solution could be found.

Thus we determined to allow to Gaither and Tatum, and to other indicted defendants similarly situated, the opportunity to achieve dismissal of their indictments on a showing of a reasonable possibility

---

61. 130 U.S.App.D.C. at 27, 396 F.2d at 676.

62. Appellant Gaither challenges the sufficiency of the evidence. As we concluded in Part V, *supra*, the case was not a close one, and the evidence was more than sufficient to go to the jury.

1. *See* cases cited in original opinion, 134 U.S.App.D.C. at —— n. 32, 413 F.2d at 1072 n. 32; *Desist v. United States*, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969); and *Fuller v. Alaska*, 393 U.S. 80, 89 S.Ct. 61, 21 L.Ed.2d 212 (1968).

that the indictment returned constituted a fatal variance from the evidence presented to the grand jury at the time the presentment was voted. In order to make possible such a showing, of course, a transcript of the grand jury proceedings would have to be made available to the defendant before the hearing on his motion to dismiss.

Noting that the question of retroactivity had not been briefed or argued, the Government has petitioned for rehearing, representing certain facts which, it is urged, renders the procedure we have adopted a more serious burden on District Court administration than we had thought, and hence requesting that the retroactive effect of our decision be confined to appellants Gaither and Tatum alone. At the same time, counsel for appellants have moved for rehearing, noting that they had assumed, in the absence of any Government request to the contrary, that any ruling favorable to them on the merits would be given full application to their clients' case; they now contend that appellants' convictions should be reversed, under the flat rule which we have announced for indictments brought after April 8.

We granted rehearing, and we have concluded, first, that indictments brought before April 8, other than that in the case at bar, will not be subject to challenge for the procedural defect found in this case, and, second, that in accordance with the flat rule applicable to post-April 8 indictments Gaither's and Tatum's convictions must be reversed and their indictment dismissed.

## I

The Government's case for complete prospectivity fails to establish all the circumstances which have moved the Supreme Court to deny retroactive effect to some of its criminal procedure decisions. In each of those Supreme Court cases, a major change in the law was announced, overruling settled precedent, and rendering inadmissible evidence which prosecutors had used in reliance upon prior judicial approval.[2]

The situation here is quite different. This case is the first occasion we have had to review the particular indictment procedure in question. Apart from the rulings of the District Court which we reversed, we found no precedent in any jurisdiction, and the Government has cited none, upholding any such procedure. The procedure was rather clearly in violation of the applicable Federal Rule, which requires that each "indictment" (not presentment) be "found only upon the concurrence of 12 or more jurors."[3] The constitutional rulings cited in our original opinion[4] gave ample indication of the reasons for, and the importance of, the rule in question. Thus we have not in any substantial sense "made new law"; rather we have applied clear existing principles to what appears to be a uniquely deviant procedure. We treated the issue at some length in our original opinion because it seemed an important one in its practical consequences, but as a question of law it was "not of an intricacy proportioned to its interest."[5]

However unjustified the Government's reliance on this obviously defective procedure,[6] it remains the case

2. Lee v. Florida, 392 U.S. 378, 88 S.Ct. 2096, 20 L.Ed.2d 1166 (1968); Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

3. Rule 6(f), FED.R.CRIM.P.

4. Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); Ex parte Bain, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887).

5. Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176, 2 L.Ed. 60 (1803).

6. We note that the Government took the perilous course of continuing to use chal-

that in the public interest the chief factor in determining prospectivity is the actual disruption retroactive application of a decision would cause. The Government has represented to us certain facts which appear to indicate that even the partially retroactive application which we formulated in our original opinion would be substantially more disruptive than we had reason to expect.

Approximately 1,100 cases in which indictments have been returned are now awaiting trial. The Government seems to concede that timely motions to dismiss the indictment under our decision could be made in all of these cases. Without passing on the merits of this concession,[7] we agree that *Gaither* hearings could be required in many of these cases. We were aware of these facts in adopting our original resolution of the problem.

The Government now further represents to us what we did not know before, that transcripts of grand jury minutes, which are prerequisites to *Gaither* hearings as we contemplated them, cannot be made generally available without seriously disrupting the District Court calendar. It seems that of the grand jury proceedings in the 1,100 pending cases, approximately one half were recorded in stenotype notes by the single fulltime court reporter assigned to the grand jury.

The others were recorded by various independent reporters hired on a contract basis. We are told that in the opinion of the fulltime reporter, only he can transcribe his own stenotype notes. If he works full time on transcribing these notes, he can perform at the rate of about 50 transcripts a month; thus it could require him up to *one year* to transcribe the grand jury minutes in all pending cases.

Of course, a substantial fraction of the sets of minutes have already been transcribed pursuant to requests by defendants for impeachment purposes. And it is unlikely that *Gaither* motions would be pressed in anything approaching 100 per cent of the pending cases, even if it were held that timely challenges could be made in all of them.[8] Still, it appears that the bottleneck in grand jury transcripts would bring about substantial additional trial delays in the District Court, for both defendants who pressed *Gaither* motions and those who did not.

In many respects, we are troubled by the Government's plea of a crisis in transcribing grand jury proceedings as a ground for denying retroactive effect to our ruling. The notion that defendants have a right to access to grand jury transcripts is not a new one, introduced into the law by our decision of April 8.

lenged procedure through the weeks between oral argument and decision of the case, despite indications at argument that the court's clear first impression was that the procedure was defective. Some hundreds of questionable indictments were accumulated thereby. We note further that the change to the proper procedure can hardly be a costly or difficult one, and was made without apparent difficulty on the issuance of our opinion.

7. As we noted in footnote 2 of our original opinion: "Rule 12(b)(2), Fed.R.Crim.P., provides:
 'Defenses and objections based on defects in the institution of the prosecution or in the indictment or information other than that it fails to show jurisdiction in the court or to charge an offense may be raised only by motion before trial. * * *'
 "Rule 12(b)(3) provides that motions of this type 'shall be made before the plea

is entered, but the court may permit it to be made within a reasonable time thereafter.'
 " * * * [W]e have read Rule 12 in this Circuit to allow motions after the plea in all cases, provided they are made within a reasonable time after appointment of counsel. McGill v. United States, 121 U.S.App.D.C. 179, 181–182, 348 F.2d 791, 793–794 (1965)." ·
 In our footnote 32, we stated: "However, pretrial challenges to the defect found here can be made in cases now pending trial." This merely tracked the language of Rule 12(b)(2), which we had cited in footnote 2, and did not foreclose application of Rule 12(b)(3) (or its local correlate, District Court Rule 87(d)), which we had cited immediately after Rule 12(b)(2) in footnote 2.

8. *See* Note 7, *supra.*

At least since the decision of the Supreme Court in Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), a major trend in criminal procedure has been toward liberalized defense access to grand jury minutes. The sound principle behind the trend is that "[i]n our adversary system for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant fact." 384 U.S. at 873, 86 S.Ct. at 1851, 16 L.Ed.2d 973.

Both the Second and Seventh Circuits have furthered this trend by decreeing in their supervisory power that defendants should have automatic access to the grand jury testimony of Government witnesses at trial, except where the Government can show an overriding case for secrecy, such as national security. United States v. Youngblood, 2 Cir., 379 F.2d 365 (1967); United States v. Amabile, 7 Cir., 395 F.2d 47 (1968). Both *Youngblood* and *Amabile* became effective for trials beginning the day after the decisions came down. Thus in their immediate effect on the demand for grand jury transcripts, they were virtually identical with our first opinion in this case—almost all defendants in trials starting the morning after the decision and thereafter had the right to demand grand jury transcripts. Yet no claims of governmental inability to cope with this situation are recorded in or after those decisions; indeed in *Amabile* the Government concurred in the adoption of the *Youngblood* rule. Apparently in those Circuits, *Dennis* was seen as the handwriting on the wall, and arrangements were made to have transcripts of grand jury minutes ready for trial.

In this Circuit, we have not yet adopted the *Youngblood* rule. We have, however, liberalized our standards of discovery of grand jury testimony. Allen v. United States, 129 U.S.App.D.C. 61, 390 F.2d 476 (1968). The Government informs us that it can meet the current demand for grand jury transcripts with the present system, but the Government's own account of the fragility of that system leads us to doubt whether it can meet the test posed by growing awareness of the availability of grand jury testimony among the defense bar and by the growth of judicial doctrine in the area.

Still, however unjustified may be the bottleneck in grand jury transcripts, the Government represents to us what we have no reason to disbelieve—that the bottleneck exists, and that it will cause serious delays in trial in the District Court. Such delays further erode the right of the people to have defendants brought to swift justice. At least as important, they may violate defendants' constitutional rights to a speedy trial—rights which, at least with respect to defendants not out on bail, are close to being denied *en masse* today in the current condition of the criminal trial calendar.

We do not denigrate the right of indictment by a grand jury when we find that whatever infringement of that right is allowed by wholly prospective application of our *Gaither* ruling is outweighed by the danger of serious further aggravation of our speedy trial crisis. As we pointed out in our original opinion, the indictment procedure used in the past in this jurisdiction provided substantial checks against indictments which departed from the will of the grand jury. We expect that the vast majority of pending indictments could have withstood the *Gaither* hearings. In these circumstances, we conclude that the presumption we established subject to rebuttal in our first opinion—that pending indictments signed by the foreman of the grand jury would have been approved by the requisite 12 jurors—must now be made irrebuttable.

II

There remains, after the dismantling of our apparatus for determining prejudice, the question of disposition of the cases of Gaither and Tatum themselves. The alternatives are to apply our reading of Rule 6 with total prospectivity, or to allow retroactive application of it to Gaither and Tatum.

In making its "prospective only" rulings, the Supreme Court has invariably adopted the latter course, and though those rulings may not be technically binding upon us, we find the reasons supporting them persuasive. The Court has noted "the command of Article III of the Constitution that we resolve issues solely in concrete cases or controversies," [9] and also "the possible effect upon the incentive of counsel to advance contentions requiring a change in the law." [10] The latter point is particularly telling. Lawyers are meant to serve their clients, and they cannot at the same time serve the growth of the law if they know that time spent and emphasis expended upon novel or potentially disruptive points of law are unlikely to advance their clients' interests.

The supervisory aspects of our original opinion are modified as set out in Part I of this opinion. The judgment of affirmance is vacated, the convictions are reversed, and the case is remanded to the District Court with instructions to dismiss the indictment.

So ordered.

9. Stovall v. Denno, 388 U.S. 293, 301, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967).

