Helen FRIGILLANA, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 16493.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 31, 1961.

Decided June 19, 1962.

Mr. William A. Tinney, Jr., Washington, D. C., with whom Mr. Wesley S. Williams, Washington, D. C. (both appointed by the District Court) was on the brief, for appellant.

Mr. Charles T. Duncan, Principal Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., Nathan J. Paulson, Harold H. Titus, Jr., and Miss Doris H. Spangenburg, Asst. U. S. Attys., were on the brief, for appellee.

Before WILBUR K. MILLER, Chief Judge, and BASTIAN and BURGER, Circuit Judges.

BURGER, Circuit Judge.

An indictment returned November 10, 1952, charged that Helen Frigillana murdered Etta M. Mitchell on October 10, 1952. In early 1953 Mrs. Frigillana was adjudged mentally incompetent to stand trial and was committed to St. Elizabeths

Hospital. In April, 1961, having been found competent to stand trial, she was tried and convicted of second degree murder. Pending this appeal, Mrs. Frigillana has been confined in St. Elizabeths.

### (1.)

For some years prior to the date of the crime, appellant had been employed at St. Elizabeths Hospital as a nurses' aide or attendant. She lived with her two children apart from her husband. Sometime before October, 1952, when the shooting took place, one John Mitchell rented a room in appellant's apartment, and began to stay there intermittently and a close relationship developed. On the evening of October 10, 1952, the deceased, Etta Mitchell, to whom John Mitchell was married, appeared at appellant's apartment door where an altercation developed. During this incident Etta Mitchell struck both John Mitchell and the appellant with a piece of metal pipe. Mitchell managed to separate the deceased from the appellant and took her outside. Appellant obtained a pistol from her apartment and shouting "You hit me!", shot the deceased at a distance of seven to eight feet, inflicting the wound from which she died. The entire episode took place within a very brief period of time. It is not contested that appellant committed the act charged. The sole question here is whether the defendant was entitled to a directed verdict of acquittal by reason of insanity.

At the trial the defendant presented seven qualified psychiatric witnesses from the staff of St. Elizabeths Hospital to testify as to her mental condition before, at the time of, and since the date of the act charged. Their testimony may be summarized briefly. Four who had treated her in the latter phase of her confinement gave no opinion as to her mental state in October, 1952, when the killing took place. Of the remaining three witnesses, Dr. Reichenback and Dr. Dobbs expressed opinions that the defendant had a mental disease at and before the time of the crime, and Dr. Harris thought it "quite possible that she

could have been suffering from an illness in * * * 1952." Dr. Reichenback diagnosed her condition as undifferentiated psychotic disorder going back to October, 1952. Dr. Dobbs gave a diagnosis of schizophrenic reaction, chronic undifferentiated type with psychoneurotic features commencing sometime prior to October, 1952. Dr. Dobbs also testified: "She developed abnormal fears, felt that perhaps people were going to harm her more than one would ordinarily think, and this began about 1948, as far as I can tell."

Thus there is undisputed evidence of a serious mental disease existing at and before the time of the shooting. The government did not challenge this at the time of the trial and does not challenge it on this appeal. What we are really confronted with is whether the government proved beyond a reasonable doubt that the shooting was not the "product" of the mental disease in accordance with the burden of proof standard of Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895).

Turning again to the medical testimony we find that four of the psychiatrists who treated appellant were, for varying reasons, unable to express any opinion as to a causal connection between the disease and the act. Dr. Reichenback said she did not know whether "that crime was a product of that mental illness." On cross-examination she stated: "From the psychiatric standpoint I think she was ill, but whether or not the psychiatric condition caused her to do this or not I cannot tell you." Dr. Dobbs on cross-examination testified that "I personally still am not able to form an opinion about what this [chronic undifferentiated psychosis] * * * had to do with the alleged offense." When asked to explain his inability to express an opinion on causality he said: "in spite of her evidence of illness at that time I did not see a direct connection between the illness and this alleged crime." He described his conclusions as "very speculative." Dr. Harris testified that the

shooting could have been independent of appellant's mental disease or could have been a product of it, in short that one conclusion was as possible as the other.

The government offered no evidence of any kind on the issue of mental competence either during its case in chief or at the close of the defense case, so that the government's case consisted solely of evidence of the events of the shooting and cross-examination of the defense experts.

### (2.)

In this state of the evidence the issue is whether the government has met its burden of proving beyond a reasonable doubt either (1) that the appellant has no mental disease or (2) if existence of a mental disease is shown, that the shooting was not a product of that disease. The Davis case imposed on the prosecution the heavy burden of proving beyond reasonable doubt that the accused was mentally competent according to the applicable standards of criminal responsibility of the particular jurisdiction. The effect of the Davis burden became far more stringent in a qualitative sense under Durham v. United States, 94 U.S. App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430 (1954), because of the ambiguity and lack of established meaning of the terms "mental disease" and "product." It is the interaction of these two cases which produces the difficulties which were criticized by the minority opinions in Blocker v. United States, 110 U.S.App. D.C. 41, at pages 45 and 61, 288 F.2d 853, at pages 857 and 873.

▆▆▆ This case vividly illustrates the tangled web we have spun for ourselves under the ambiguous labels of Durham v. United States. Of seven expert witnesses who had observed the defendant, some for as much as eight years, not one could say that the mental disturbance "produced" the killing or that he could see any connection between the disturbed mental condition of the defendant and the act of killing. *But neither could they say categorically that the mental condition did not "produce" the act.*

We submit that under a standard or test based upon the basic concepts of criminal responsibility—that is cognition and volition or capacity to control behavior—there might well have been some meaningful medical testimony which would have clarified the issue somewhat.[1] The experts, who had no opinion on whether the killing was a "product" of the mental disturbance, might well have said—had they been asked and permitted to say—that she did or did not at the time meet a more rational test which embraced these basic concepts of recognition of the nature of the act and ability to control or conform conduct to legal standards.

As we see it the difficulty of the experts in this case arose in large part because they did not understand what "product" means as stated in our rule, for the term "product" has no special generally accepted meaning in medicine. And of course it has no special meaning in law. We believe this problem warrants continuing examination as our experience under the "product" test mounts.

The need to re-examine the terms of our rule is closely related to the problem of the burden of proof. The *weight* of this burden, as distinguished from where the burden lies, is inseparably connected with the terms or words in which the standard of responsibility is stated. If the standard is expressed in abstract or ambiguous terms the burden becomes correspondingly more onerous than when expressed more concretely. To prove a negative proposition beyond a reasonable doubt is in itself a very heavy burden. But that heavy burden is vastly compounded when the government must

---

1. Indeed this might conceivably have been the case had the prosecution made use of our explicit preservation of the McNaghten and irresistible impulse tests. See Durham v. United States, 94 U.S. App.D.C. 228, 242, 214 F.2d 862, 876 (1954), and Douglas v. United States, 99 U.S.App.D.C. 232, 238, 239 F.2d 52, 58 (1956).

prove the negative case in terms like "product of disease," which are so vague and ambiguous that once a disease is shown to exist it is extraordinarily difficult for any psychiatrist to say or for the government to establish *beyond a reasonable doubt* that the act and the disease are unrelated. The present case eloquently illustrates that point. This is true partly because the psychiatrist, in his medical approach to the patient in the hospital, almost as a matter of course, assumes that every abnormal or anti-social act by a mentally ill person has a psychiatric explanation. As a tentative working hypothesis in the hospital, and as a diagnostic device that approach may well be valid. But our observation is that psychiatrists, when testifying *as expert witnesses*, tend to continue to *assume* that a causal connection exists whenever a mentally disturbed person commits an unlawful act. See e. g. Martin v. United States, 109 U.S.App.D.C. 83, 284 F.2d 217 (1960). Dr. Roche, in his book The Criminal Mind concedes the enormity of the government's burden of proof saying:

> "I have stated my belief that the 'product' question can be answered only in the affirmative or not at all. Roche, The Criminal Mind, 270, (1958)."

If our objective is to excuse all mentally or emotionally disturbed persons from criminal responsibility we should frankly and honestly say that and proceed accordingly, for that is precisely where our rule, as applied, is taking us. Professor de Grazia described this tendency:

> "It can, therefore, be expected that few psychiatrists will hesitate to find the necessary causal connection between the crime and the disease, once they have determined the disease to exist, knowing a crime has been committed * * *." [2]

Professor Hall in his work on criminal law states:

> "No psychiatrist or group of psychiatrists can now establish that a mental disease is the *cause* of a subsequent act in the intended sense of that term * * *. If that kind of causal connection cannot be established, how can anyone prove beyond a reasonable doubt that no such connection exists? Hall, General Principles of Criminal Law, 2d Ed. 507."

Since these comments were expressed in relation to the Durham rule they are especially relevant and our experience over 8 years demonstrates their accuracy.

The instant case is a remarkable exception in our experience with this problem for not one of the psychiatrists was able to testify that there was a causal relationship but neither could they say categorically that none existed. They simply did not know. In Blocker v. United States, supra, we who are sitting on this case tried to point out the inherent ambiguity of the word "product" when used in a rule of law which seeks to define criminal responsibility. There we referred to the views of Dr. Roche, who, when discussing this aspect of our rule,[3] said:

> "The idea that mental illness *causes* one to commit a crime or that it produces a crime has an unmistakable lineage from demonology * * *. Can one supply an explanation for the observation that 'mental illness' does not invariably produce crime; in fact, [it is] the exception to the rule?"

This raises the interesting and very important question of why this court used such a word as "product," other than the fact that in our 1954 opinion we adopted verbatim the original New Hampshire Rule of 1869,[4] but without the later modification which substantially altered its

---

2. de Grazia, The Distinction of Being Mad, 22 U.Chi.L.Rev. 229, 342–43 (1955).

3. Roche, Durham and The Problem of Communication, 29 Temp.L.Q. 264, 269 (1956).

4. State v. Pike, 49 N.H. 399 (1869).

character. That modification was to add by way of explanation an instruction

> "If the defendant had an insane impulse to kill his wife, which he could not control, then mental disease produced the act. *If he could have controlled it, then his will must have assented to the act, and it was not caused by the disease, but by the concurrence of his will, and was therefore crime.* (Emphasis added)." [5]

It has sometimes been suggested that "product" is a good, solid, simple word which any layman can understand. We agree that this is true when that word is used in its usual and ordinary sense. It indeed has meaning when so used. For example, everyone knows what is meant by the statement that steel is a product of a steel mill, coal of a coal mine; that hens' eggs are a product of hens, a hangover of excessive imbibing. Our national folklore expresses this general idea in the aphorism "where there's smoke, there's fire." We understand and accept these propositions because ordinary experience in daily life has long demonstrated that they are true and we may safely act on them in forming judgments.

But does this kind of relationship exist between mental disease and crime? Are criminal acts generally and usually a "product" of mental disease or defect? If crime and disease are indeed related in the same sense that when we see smoke we can ordinarily act on the assumption that there is some kind of combustion nearby, then perhaps "product" is a safe word to rely upon. If that is not the case, "product" is not a safe word to use in this context.

Dr. Szasz, a psychiatrist with a wide background in dealing with the prob-

lems of the criminal law seems to regard the "product of disease" concept as a spurious one.

> "Durham takes the notion of 'mental illness' and requires the psychiatrist and the jury to determine whether the criminal act in question was committed as a result of such 'illness.' This, too, [like disease] is supposed to be a 'fact.' Unfortunately, this not only cannot be a fact, but it cannot even be a theory. * * * The very occurrence of the crime—of almost any crime today—functions as a powerful impetus for the creation of a theory to explain it. Szasz, Psychiatry, Ethics, and the Criminal Law, 58 Colum. L. Rev. 183, 190–91 (1958)."

In the same vein Dr. Roche states:

> "Second, if mental illness causes some to commit crimes, and not others, do we have a reliable method of discriminating those crimes which have no causal nexus with mental illness? * * * To [this] the answer is that psychiatry has yet to discover a method. Roche, The Criminal Mind, 260, (1958)."

In the face of all these considerations we have, since 1954, used "product" as one of two key words in an important rule of law on an unstated but tacit assumption that there existed a natural or a scientifically accepted nexus between mental disease and unlawful conduct. We as judges have acted as though psychiatry recognized some usual connection between mental disease and crime. Now that it is clear that psychiatry does not accept any such notion it remains to be seen whether we will continue to act on this utterly false premise.[6]

There may conceivably come a time, for who can predict what science will un-

---

5. State v. Jones, 50 N.H. 369, 399 (1871).

6. In Blocker v. United States, 110 U.S.App. D.C. at 50, 288 F.2d at 862 (1961), concurring opinion, we pointed out that experts ought not be permitted to express a conclusion opinion on whether a particular act was or was not the "product"

of mental disease and that United States v. Spaulding, 293 U.S. 498, 55 S.Ct. 273, 79 L.Ed. 617 (1935) and Simmons v. United States, 92 U.S.App.D.C. 122, 206 F.2d 427 (1953), preclude such opinions. See dissenting opinion in Campbell v. United States, 113 U.S.App.D.C. ——, 307 F.2d 597.

fold over the years, when the idea is accepted that *all* crime is a manifestation, i. e., a *usual* product of mental disease in the sense that we know steel to be the product of a steel mill or that smoke signals fire. When that day comes and medical science accepts that proposition as scientifically demonstrable, then the law may well act on science and its findings. But it is not true today and we think it is not the function of the law to *anticipate* science; nor is the sound evolution of law served by trying to take "great leaps" ahead of science. Law must develop and change and it must take into account the discoveries of science but in the present state of psychiatry the use of the word "product," especially if unexplained, is "the kind of alchemy that has no counterpart in" [7] actual experience of either law or science.

Our 1954 standard of criminal responsibility was based on the notion that the instruction could be stated "simply." Nothing could be farther from reality than that. This is one of the most elusive and difficult areas of the criminal law and it cannot be resolved with a pat slogan or a phrase which relies on words that at best are ambiguous and at worst are meaningless in the context in which they are used. We who are responsible for this case have advocated a change in our standard, suggesting various alternatives all based on the concept that the central issue is criminal intent or *mens rea*. We adhere to the view that any formulation or rule is adequate so long as it embraces the basic postulates urged in Carter v. United States, 102

U.S.App.D.C. 227, 252 F.2d 608 (1957), and which we explored in Blocker v. United States, supra, i. e., cognition, volition and capacity to control conduct.[8]

The adoption of the product test in 1954 was said to be to open the inquiry to the widest possible scope of medical testimony, but case by case we have tended to *narrow* the inquiry rigidly to the magic words "disease" and "product," neither of which has acceptance as being a scientifically reliable term in psychiatry. At the same time we continue to reject even so much as explanation to the jury of the concept whether the defendant had capacity to regulate and control his behavior and conduct, which is a concept accepted and used by psychiatrists. If we are not prepared to make a fresh start we can accomplish virtually the same result by giving meaning and content to the "product" test by an explanation in terms we have previously announced but which we have failed to implement. The "free agent" language of the Carter case is a dead letter until and unless we do this. Carter v. United States, 102 U.S.App.D.C. at 236, 252 F. 2d at 617.[9]

In this case, however, the government made no request for an instruction embracing the concepts suggested in the Carter, Douglas or Blocker opinions; nor was the examination of expert witnesses directed to the questions of cognition, volition or capacity for control of behavior such as is authorized by Durham's preservation of the McNaghten and "irresistible impulse" tests. See Durham v. United States, 94 U.S.App. D.C. at 242, 214 F.2d at 876, and Doug-

---

7. Roche, Durham and The Problem of Communication, supra note 3.

8. As we see it the proposal advanced by the American Law Institute's Model Penal Code and the formulation adopted by the Third Circuit in United States v. Currens, 290 F.2d 751 (1961), are improvements over Durham v. United States because each embraces these basic concepts.

9. The views here expressed on the inadequacy of the term "product" to measure

criminal responsibility are not to be taken as a modification of the rule expressed by this court in Durham v. United States. Durham is followed and applied in this case and remains binding. The views advanced in this opinion concerning the ambiguity of the term "product" are advanced as the reasons why the sitting division thinks the "product" test instruction, without explanation in terms of capacity for control of behavior, is wrong and *ought* to be changed.

las v. United States, 99 U.S.App.D.C. 232 at 238, 239 F.2d 52, at 58. In these circumstances, we have no choice but to apply the existing standard allocating the burden of proof in accordance with the Davis case.

We hold, therefore, that the government has not sustained its burden of proof and that a directed verdict should have been entered finding the appellant not guilty by reason of insanity. The District Court should now set aside the judgment of conviction and grant appellant's motion for judgment of not guilty by reason of insanity.

Reversed.