**Thomas H. ADAMS, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 22046.**

United States Court of Appeals District of Columbia Circuit.

Argued Feb. 25, 1969.

Decided May 8, 1969.

Petition for Rehearing Denied June 13, 1969.

---

1. The Government indicated that the instruction issue "need not be reached since appellant is entitled to a new trial.
\* \* \* "

Mr. Larry J. Ritchie, Wheaton, Md., with whom Mr. William W. Greenhalgh, Washington, D. C. (both appointed by this court) was on the brief, for appellant.

Mr. John G. Gill, Jr., Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., and Frank Q. Nebeker, Asst. U. S. Atty., were on the brief, for appellee.

Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and LEVENTHAL, Circuit Judge.

BAZELON, Chief Judge:

The appellant contends that the trial court erred as a matter of law in rejecting his insanity defense. The case arises from the hold-up of a National Capital Housing Authority office on June 21, 1967. Four employees witnessed the robbery and getaway, at least one of whom saw the license plate of the rented car in which the hold-up man drove away. The appellant was arrested several hours later when he attempted to pay the rental fee for the car.

After a trial without a jury, Adams was convicted for robbery of property belonging to the United States, assault with a dangerous weapon and carrying a dangerous weapon under 18 U.S.C. § 2112 (1964) and 22 D.C.Code §§ 502, 2901 (1967). The evidence of guilt was strong, and the defense relied principally upon the claim that the offense was the product of mental illness. Since two of the three expert witnesses supported this defense, as did the report of Saint Elizabeths Hospital, where the appellant was committed before trial under 24 D.C. Code § 301(a) (1967), we must determine whether a reasonable mind contemplating all the evidence could have concluded beyond a reasonable doubt that the crime was not the product of mental illness.

I

After a series of petty offenses as a juvenile for which he was placed upon probation, the appellant was sent to the National Training School in 1938 for housebreaking. He has spent 28 of the 31 years since then in a succession of reformatories and prisons. Most of his numerous convictions are for housebreaking. On the nine occasions he has been free in the past 30 years, he has never succeeded in staying out of jail for as long as a year; in the last 20 of these years his longest period of freedom has been five months. When arrested for the hold-up involved in this case, he had been free on an appeal bond for less than a month after serving 24 days of a 90-day sentence for attempted housebreaking.

The experts testifying at trial presented conflicting explanations for the appellant's repeated offenses. Dr. William Schwartz, the staff psychiatrist at Saint Elizabeths Hospital who had examined Adams during his Section 301(a) commitment, diagnosed the appellant as suffering from an antisocial-reaction personality disorder. He acknowledged, however, "[T]he label * * * is simply picked out of a book. It really doesn't completely describe Mr. Adams."

Although Dr. Schwartz stated that his evaluation was based upon his personal interviews with Adams and the results of psychological tests conducted at the hospital, he also attached substantial importance to the appellant's criminal record. Dr. Schwartz testified that the pattern of repeated offenses, each occurring close upon the heels of release from prison, was more significant than the total time spent in prison. He refused, however, to follow the prosecutor's invitation to say that recidivism alone would indicate a mental disturbance:

Q Now, the mere fact that he has been convicted seven times of housebreakings and [spent] 28 out of the last 30 years in prison, does that give him a psychiatric problem?

A   That is certainly part of it, yes.

Q   Is that alone, the mere fact that this man commits all of these crimes, *does that make him mentally ill,* in your opinion?

A   Not that alone, no.

Dr. Schwartz rather regarded the fact that the appellant "is a very poor criminal" as merely one manifestation of his general inability to cope with life: "He keeps doing the same stupid things over and over again." The appellant's personal life, for example, Dr. Schwartz found as uniformly unsuccessful as his professional life: "He can't live with anybody. He can't form any relationships. * * *"

To illustrate the poverty of labels, Dr. Schwartz testified concerning Adams' "other characteristics which are not included under the definition of antisocial reaction":

> One of them is that he has never really grown up. He is a very immature dependent man who you might say needs to be taken care of and this is what happens in prison. His responsibilities are much less in prison than they are outside and as a result, he *is able to function much better in* prison.

Although Dr. Schwartz was willing to testify that the appellant was mentally ill "for the purpose of court," he was even warier of that label than of "antisocial reaction" as a diagnostic category:

> I would say that Mr. Adams has psychiatric problems and is within the field of psychiatry and for a psychiatrist to deal with, but a mental illness, whether he is suffering from it, that is an entirely different matter altogether.

Dr. Elliott Blum, a psychologist at Saint Elizabeths Hospital who also testified for the defense, agreed with Dr. Schwartz that the appellant suffered from a psychiatric problem but differed as to its dynamics. On the basis of a psychological test he administered before the 1967 trial, and to a lesser extent on the basis of certain 1960 tests performed at Saint Elizabeths during an earlier Section 301(a) commitment, Dr. Blum "felt Mr. Adams was somewhat more tormented inside and—than an antisocial reaction is and he has more anxiety than the antisocial reaction." Although he agreed that the essential immaturity of the appellant's personality prevented him from entering into anything but the most shallow relationships with other people, Dr. Blum was inclined to believe that Adams' criminal offenses represented a species of defense mechanism rather than a primary manifestation of his character. The high anxiety levels shown by the appellant in the psychological test results, together with certain test responses indicative of a schizophrenic thought process, suggested to Dr. Blum that Adams

> is a very immature, a very insecure, very inferior feeling person who instead of being overwhelmed with his symptomatology in terms of just, as we say, go off the deepend, he is able to utilize certain types of defenses, certain types of adaptive behavior which keeps his self-esteem up to a level where he will not fall apart.

Accordingly, Dr. Blum preferred to describe the appellant as a pseudo-neurotic schizophrenic. By his analysis, Adams' criminal offenses reflected "acting out defenses * * * that he uses to mask * * * [the] underlying basic psychopathology being his schizophrenia."

Dr. Morris Platkin, the psychiatrist in charge of the maximum security facility at Saint Elizabeths Hospital, testified for the Government in rebuttal that the appellant was without mental disorder. Although Dr. Platkin had never examined Adams, he had scrutinized the hospital records and presided over the staff conference in 1967 at the time of the appellant's pretrial commitment. Adams' behavior patterns did not, for Dr. Platkin, indicate a sociopathic personality of the antisocial reaction type:

> [M]y interpretation of what is meant by sociopathic personalty is—an antisocial reaction is the type of individual who to begin with his crim-

inal activities are generally of the manipulating kind. They do not involve aggressiveness whether against an individual or property in the sense of breaking into. They would involve, for example, check writing or various types of confidence activities. * * * [I] don't believe I have ever met a sociopath who has committed housebreakings. This isn't the kind of things that they do.

In response to a question asking generally for the "types of things you look for in determining whether * * * a man was mentally ill," Dr. Platkin stated, "First and foremost * * * is whether the individual was at all aware of what he was doing and why he was doing it." He found that "Mr. Adams was fully aware of what he was doing and why he was doing it." Dr. Platkin continued, "The other things I would look for is the extent to which this behavior might represent a compulsion on his part. * * * " Later in his testimony, in discussing what he would look for in determining "whether these acts are sick acts," Dr. Platkin elaborated his views:

> Well, primarily whether, one, if they have significance over and above what appears to be on the surface, and they have some special meaning to the individual and so different from what the community expects as reasonable then we would call him bizarre—bizarre acts or whether the acts may not be inconsistent with what we find frequently in the community but whether the individual does them out of a sense of great compulsion. In effect, he does not want to do these type of things but I feel an inner urge to do it and of such a degree that I know they are wrong but I have got to do them. * * *

Dr. Platkin did not feel that the appellant committed crimes because breaking into a house, for example, held any bizarre significance for him or because of any great compulsion:

> [M]y own opinion is that he learned that he perhaps obtains some degree of survival this way that is a lot easier maybe and more profitable than working at routine jobs. * * * I would venture to say that Mr. Adams discovered he could probably earn more by this mode of living than by working 60 hours a week for $50 a week.

The conflict in expert testimony thus seems to reduce in substantial measure to disagreement concerning the importance of the appellant's lifelong criminal behavior as an indicator of mental illness. Dr. Platkin concluded—as undoubtedly would much of the community—that a perfectly rational economic man with "limited schooling * * * and the lack of technical knowledge" might turn to robbery and housebreaking as the easiest, indeed perhaps the only way to satisfy his expensive tastes. Dr. Schwartz commented, on the other hand, "he says he committed at least 2000 crimes—housebreakings. He commits 2000 housebreakings just to get money for gambling and because he likes nice clothes. That is no explanation as far as I am concerned."

And Dr. Blum, criticizing the view that Adams has simply devoted a life to earning a good living in a businesslike if criminal manner, stated,

> I think a professional criminal would be a well—the best professional criminal is a well integrated individual. Mr. Adams is not. A professional criminal has friends and can stick to a job, how be it but he can stick to it. A professional criminal can meet stresses and can meet every day living and has loyalties towards different groups and things of this sort.

It would, of course, grossly oversimplify the analyses of the experts testifying at trial to reduce their disagreement to the bald question of whether a persistent criminal is mentally ill simply because he is an inept, unprofessional criminal. All the witnesses attempted to evaluate the appellant as an individual, as something more unique and consequently more puzzling than a "very poor criminal." And on this level Dr. Schwartz gave probably the best explanation of their disagreement: "It is simply that the time the

hospital has for examining these patients, we can not learn to know what the basic motivation is of the patient."

This fact is nowhere better shown than by the inability of all the witnesses to integrate their knowledge of the appellant's unhappy upbringing to his subsequent disastrous adulthood. Interviews with Adams, his mother and a sister, if accepted on their face, revealed that his father was an untrained "country doctor" and music teacher who, after raising four sons by a first wife, married a woman many years his junior who bore him five daughters and finally a son, the appellant. Perhaps because of the enmity which had arisen between Mr. Adams senior and his sons by his first marriage, he never displayed anything but loathing toward the appellant. While stern toward his daughters—and his second wife, who because of the gulf in age he treated as a child herself—the father was by all descriptions mean and even vengeful toward his son. On occasion he showed overt hostility to the appellant, such as by reportedly pulling his hair out at the roots after beginning to give a haircut. Whenever the mother attempted to be kind to the only son, the father would force her to stop and sternly warn her against spoiling the boy. Not surprisingly, the appellant came to hate his father, and reported that he felt absolutely no remorse when the senior Mr. Adams died at the age of 85.

Dr. Schwartz, while testifying that "we do know that the home situation was a very pathological one," felt that the information available concerning the home and its effect upon Adams was too sketchy to permit evaluation of any relationship between it and his psychiatric problems. Dr. Blum, the psychologist, stated that in his opinion there was some relationship between the home situation and the appellant's condition as an adult, but was able to suggest only in the most general way the possible effect of this background upon Adams. Dr. Schwartz testified that he considered the information available concerning the appellant's family history in reaching his conclusion that the appellant had no mental disorder, but did not discuss the significance of such an upbringing specifically.

## II

When the defendant in a criminal trial raises the insanity defense by presenting "some evidence" of mental illness, the Government of course must bear the burden of proving beyond a reasonable doubt [1] that the offense was not the product of a mental disease or defect. In this case there was unquestionably some evidence of mental illness; the trial judge acting as fact-finder, however, found beyond a reasonable doubt that the appellant was a responsible agent at the time of his offense.

To find that there was insufficient evidence to support his judgment, we would need to conclude that a reasonable mind must necessarily have entertained a reasonable doubt that the robbery would not have occurred but for the mental illness of the appellant. As a realistic matter, it would indeed be difficult for any fact-finder to conclude with a high degree of certainty that Adams is not a mentally ill person, and that his latest offense was not causally related to his mental disease. A psychiatrist and a psychologist, both of whom had examined Adams, testified that he was mentally ill, and spoke in some detail of the relationship between his mental problems and his lifelong recidivism. The appellant's life history reveals a miserable childhood followed by more than thirty years of repeated incarcerations sprinkled with occasional months of freedom that led only to new offenses. Whatever evil may be, it is uncommonly difficult to discover it in the squalid life of this man.

It is equally difficult to conceive of this woefully incompetent housebreaker and robber as an economic man plying his chosen trade. In 1967 he was apprehended shortly after his crime in the same way as upon the occasion of his last

---

1. Davis v. United States, 160 U.S. 469, 487–488, 16 S.Ct. 353, 40 L.Ed. 499 (1895).

major conviction in 1960: attempting to pay the fee for the car he had rented for his getaway. It is also interesting to note, in passing, that the only loot taken in his 1960 housebreaking was three packs of cigarettes. His mother reported, when interviewed in connection with his Section 301(a) commitment, that on other occasions he had stolen only a bottle of wine at a time when he did not drink, and taken groceries at a time when his refrigerator was full.

Dr. Platkin did not feel this was inconsistent with his conclusion that the appellant was without mental disorder: "Even though a man doesn't drink, he could steal a bottle of alcohol. He could keep it or give it away to a friend or somebody else." This may be true, but almost anyone must view with skepticism the supposed mental health and rational motivations of a man who commits felonies in order to give small gifts.

The decisions of this jurisdiction have made clear, however, our reluctance to require a directed acquittal for insanity.[2] We have upon occasion refused to find that the Government has not borne its burden even when the evidence of mental illness was uncontradicted.[3] In cases where the expert testimony revealed a substantial conflict of opinion, we have been even more loath to reverse a conviction on the grounds that the evidence was insufficient to refute a properly-raised insanity defense.[4] We have emphasized time and again that "in view of the complicated nature of the decision to be made—intertwining moral, legal, and medical judgments—"[5] the insanity defense is peculiarly apt for resolution by the jury.[6] As part of its task, "The jury is free to believe any reasonable 'estimate' even though different or contrary views may also be reasonable."[7]

The appellant suggests that the standard for reversal should be different in a case where trial was held without a jury. Since a single judge arguably cannot function as a surrogate for the community nearly so well as twelve jurors, this argument has superficial appeal. But, in the first place, we would be reluctant to inject such a consideration as an enhanced chance for reversal on appeal into future defendants' decisions whether to attempt to waive their right to a jury trial. Second, the trial judge must always make the initial decision in a jury trial whether a directed acquittal for insanity is required. Since that is true, the absence of a jury in this case is not relevant to our decision.

This case presents neither the powerful showing of mental illness nor the sort of bizarre crime suggestive on its face of mental illness which have characterized the cases in which this court has found an insanity acquittal required as a matter of law.[8] The expert testimony was in conflict. It is true that Dr. Platkin's opportunity to evaluate the appellant's mental condition was limited at best. But we have affirmed convictions, however uneasily, in other cases where

---

2. *See, e. g.,* Parman v. United States, 130 U.S.App.D.C. 188, 399 F.2d 559, 567–568 (1968); Washington v. United States, 129 U.S.App.D.C. 29, 30, 390 F.2d 444, 445 (1967).

3. *See* King v. United States, 125 U.S.App. D.C. 318, 322, 372 F.2d 383, 387 (1967); *cf.* Hawkins v. United States, 114 U.S. App.D.C. 44, 46–47, 310 F.2d 849, 851–852 (1962).

4. *See, e. g.,* Horton v. United States, 115 U.S.App.D.C. 184, 317 F.2d 595 (1963); Strickland v. United States, 115 U.S.App. D.C. 5, 316 F.2d 656 (1963).

5. King v. United States, *supra,* 125 U.S. App.D.C. at 324, 372 F.2d at 389.

6. *See, e. g.,* McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847 (1962) (en banc).

7. Naples v. United States, 120 U.S.App. D.C. 123, 130, 344 F.2d 508, 515 (1964).

8. *See, e. g.,* Frigillana v. United States, 113 U.S.App.D.C. 328, 307 F.2d 665 (1962); Isaac v. United States, 109 U.S.App.D.C. 34, 284 F.2d 168 (1960); Douglas v. United States, 99 U.S.App.D.C. 232, 239 F.2d 52 (1956); *cf.* Hartford v. United States, 362 F.2d 63 (9th Cir. 1966).

rebuttal testimony left much to be desired.[9]

Guided by the prior decisions of this court, to which we adhere, and the evidence in this case, we affirm the conviction. In doing so, we cannot but note that society has proven even less able to cope with this man than he with it. Our prisons have demonstrated their inability to change the appellant's behavior. Perhaps a mental hospital would find the effort as futile. Dr. Schwartz testified, "The treatment that we can offer him is very inadequate and the chances of his personality improving * * * are very slim." If this is true, perhaps society must continue simply to lock up the appellant each time he offends. By doing so we may protect our homes. But the present criminal process allows us to pursue this legitimate goal only by the fiction that he is an evil man. The fact that the insanity defense as presently conceptualized and administered plays handmaiden to this social hypocrisy further reveals our inadequacy to respond selectively or constructively to offenders.

Affirmed.

FAHY, Senior Circuit Judge (concurring specially):

I concur in the excellent analysis and discussion in the opinion of Judge Bazelon until I reach the lines of the last paragraph which follow our affirmance of the conviction. There too I join in his note of sadness over the troubling character of such a case. Yet I cannot join in attributing our decision to the fiction that Adams is an evil man who is held responsible by reason of a social hypocrisy that he is. The court acts for society in this case. If we consider that the evidence requires acquittal on the ground of insanity we have the power and the duty so to decide and we should not affirm; rather, we should direct acquittal, as we have done in other cases. *E. g.*, Frigillana v. United States, 113 U.S.App. D.C. 328, 307 F.2d 665; Isaac v. United States, 109 U.S.App.D.C. 34, 284 F.2d 168. Society does not require us to do otherwise.

In characterizing the result we reach as due to a fiction that Adams is an evil man I assume the opinion does not intend to imply that evil itself is a fiction, or that it is fictional for the law to imply that robbery is an evil. Our present function in any event is only to decide whether the trial judge—a jury having been waived—could reasonably have concluded beyond a reasonable doubt that Adams' conduct was not the result of a mental disease or defect, but was conduct for which he was responsible under standards we ourselves have established. In making this decision I do not judge Adams to be an evil man or attribute to society a dereliction I do not myself confess. Moreover, one may differentiate between what is evil and who is evil, at the same time accepting the good faith of society in involving the individual in remedial measures.[*]

9. *See* Parman v. United States, 130 U.S. App.D.C. 188, 399 F.2d 559 (1968); Campbell v. United States, 113 U.S.App. D.C. 260, 307 F.2d 597 (1962).

* It is no departure from our affirmance to add that much could be said for sending appellant to St. Elizabeths for such treatment as is there available rather than to send him to prison:

The remedy of treatment results in the accused returning to life of the community only after disinterested experts think he may safely do so; whereas the person imprisoned enters again into the community when his sentence is served though he may not be ready for a law-abiding life. For these reasons, as well as because the criminal law does not punish in the absence of blame, we should guard against imprisonment where a reasonable doubt exists as to sanity in its relation to the crime charged.

Douglas v. United States, 99 U.S.App.D. C. 232, 240 n. 12, 239 F.2d 52, 60 n. 12.