UNITED STATES of America

v.

Arthur L. MARSHALL, Appellant.

No. 23436.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 25, 1970.

Decided Oct. 20, 1972.

Mr. William J. Garber, Washington, D. C. (appointed by this Court), with whom Mr. Irving M. Levine, Washington, D. C., was on the brief, for appellant.

Mr. Broughton M. Earnest, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., at the time the brief was filed, John A. Terry, Asst. U. S. Atty., and Nicholas S. Nunzio, Asst. U. S. Atty., at the time the brief was filed, were on the brief, for appellee.

Before BAZELON, Chief Judge, WILBUR K. MILLER, Senior Circuit Judge, and ROBB, Circuit Judge.

## PER CURIAM:

The appellant Marshall was indicted for murder in the first degree in that he shot and killed one Michael Feathers. The case was tried to a jury. At the close of the government's proof the district judge granted the defendant's motion for judgment of acquittal as to first degree murder. The jury found Marshall guilty of murder in the second degree. He appeals, complaining of several alleged errors. We find no merit in any of his contentions.

The proof for the government was that Marshall and the deceased Michael Feathers did not know each other. Some two weeks before the shooting, however, an altercation occurred between Marshall and Michael's brother William Feathers. The shooting occurred late one night when Marshall encountered the brothers on the sidewalk outside a bar. Standing some six feet from the two men Marshall called to them "come here, boy", and drew a sawed-off shotgun from under his shirt. William Feathers turned away but Michael did not, and Marshall then shot Michael in the head at close range, blowing off half of his skull. Marshall ran away, discarding the shotgun, but was soon arrested in the immediate vicinity, and the gun was recovered.

Marshall did not testify nor did he contest the government's version of the circumstances of the homicide, but he relied on a defense of insanity. As witnesses, he called his sister and a psychologist, Dr. Blum, a member of the staff at St. Elizabeths Hospital. The sister described Marshall as a drifter who, as a child, had been shifted from one home to another and who recently had been moody and upset, and had taken to drink and the occasional use of drugs. Dr. Blum testified that Marshall was a "borderline mental defective", having an intelligence quotient of 70, and that he suffered from a mental illness, a personality disorder known as "schizoid personality". According to Dr. Blum there was a relationship between this illness and the shooting, because a manifestation of the illness was a desire to appear as a big man, tough, uncaring and remorseless, although "he really feels totally inadequate and inferior".

In rebuttal the government called two psychiatrists, Drs. Kunev and Platkin, members of the staff at St. Elizabeths who also had examined Marshall. They testified that although in their opinion he was mentally ill, suffering from a schizoid personality with inadequate features, there was no relationship between his illness and the offense he had committed.

■ The appellant contends that the district court should have granted his motion for judgment of acquittal by reason of insanity. We think, however, that the question of responsibility was properly one for the jury; indeed the issue was a classic jury question. United States v. Eichberg, 142 U.S.App.D.C. 110, 439 F.2d 620 (1971); Adams v. United States, 134 U.S.App.D.C. 137, 413 F.2d 411 (1969); Parman v. United

States, 130 U.S.App.D.C. 188, 399 F.2d 559, cert. denied, 393 U.S. 858, 89 S.Ct. 109, 21 L.Ed.2d 126 (1968).

■ We deferred our disposition of this case pending our decision in United States v. Brawner, 153 U.S.App.D.C. —, 471 F.2d 969 No. 22,714 (June 23, 1972) (en banc). We now conclude that the *Brawner* case does not help the appellant, for we specifically held in that decision that it was not retroactive. 969, at 1005 of 471 F.2d n. 79. We note further that the issue of Marshall's responsibility was fully and fairly presented to the jury, in accordance with previous decisions of this court,[1] and we see no reason to believe that the jury would have reached a different result if instructed according to the formula prescribed in Brawner's case.

After the jury had been sworn the appellant moved to dismiss the indictment upon the ground that no evidence before the grand jury supported a charge of murder in the first degree. The motion was based upon the transcript of the testimony before the grand jury, which had been made available to appellant's counsel before trial. From the predicate that the indictment for first degree murder was invalid the appellant argues that he was prejudiced, because in choosing the jury several prospective jurors were excused for cause when they said that their opposition to capital punishment was such that they would be unable to render a fair and impartial verdict as to the appellant's guilt or innocence of first degree murder. The appellant reasons that he was prejudiced by the exclusion of these persons from the jury that passed on his guilt or innocence of second degree murder.

■■ The appellant's attack on the indictment and on the composition of the petit jury suffers from at least two fatal defects. First, except in extraordinary circumstances, not present here, an indictment is not open to challenge on the ground that it was not supported by adequate evidence. Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956); Lawn v. United States, 355 U.S. 339, 78 S.Ct. 311, 2 L. Ed.2d 321 (1958). Second, the appellant was not prejudiced by the exclusion of the prospective jurors. There is no indication that the jurors who were seated and who convicted the defendant of second degree murder were not fair and impartial. Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); Bailey v. United States, 132 U.S.App.D.C. 82, 405 F.2d 1352 (1968). The appellant was entitled to a fair and impartial jury, and this he had.

■ The indictment alleged that Marshall "did shoot Michael H. Feathers with a pistol" thereby causing injuries from which Feathers died. The proof of course was that the fatal weapon was a sawed-off shotgun. Nothing was said about the discrepancy when the indictment was read to the prospective jurors during the *voir dire*. Immediately after the jury was sworn, however, the prosecutor brought the matter to the attention of the court, suggesting that the variance was one of form, not of substance, and the court allowed the trial to proceed on this theory. The appellant now contends that the variance was fatal. We do not agree, although we regret such carelessness on the part of the government.

The offense charged against the appellant was that he killed Feathers by shooting him; a precise description of the firearm used was not essential to the charge. Furthermore, there is no suggestion that the appellant was in any way prejudiced by the mistake in the indictment. From the statements of witnesses and the grand jury testimony made available to him before trial, he knew what the proof would be. *See*

---

[1] In conformity with Washington v. United States, 129 U.S.App.D.C. 29, 42, 390 F.2d 444, 457 (1967) the expert witnesses did not express opinions on whether the alleged crime was a "product" of a mental disease or defect.

Jackson v. United States, 123 U.S.App. D.C. 276, 359 F.2d 260, cert. denied, 385 U.S. 877, 87 S.Ct. 157, 17 L.Ed.2d 104 (1966); United States v. Thompson, 356 F.2d 216, 225–227 (2d Cir. 1965), cert. denied, 384 U.S. 964, 86 S.Ct. 1591, 16 L.Ed.2d 675 (1966).

■ Finally, the appellant complains of the district court's instructions on malice and manslaughter. Having examined the instructions we find nothing in them that warrants reversal.

The judgment is affirmed.

BAZELON, Chief Judge, dissenting:

This case once again raises the troubling question of the extent, if any, to which our Brawner [1] decision should be given retrospective effect.[2] In Brawner we adopted an ALI-derived formulation for the responsibility defense. The only fault in the Durham formulation—upon which we all agreed—was that its "product" phase had been construed, wittingly or not, in a manner that permitted almost total reliance on the experts to the exclusion of the jury.[3] The underlying substantive reason for our reformulation of the insanity defense in Brawner was a prophylactic one, to protect the jury's role by minimizing this distorting effect on the responsibility inquiry.[4]

At trial in the instant case, appellant relied exclusively on an insanity defense; the expert witnesses agreed that he suffered from an abnormal condition of the mind but disagreed as to whether his criminal act was a product of his impairment. Productivity was effectively the only issue in dispute and the experts conclusory testimony on that subject clearly raised the spectre of expert domination. The very danger of distortion we sought to eliminate in Brawner permeated Marshall's trial.[5]

In Brawner the majority announced that its reformulation of the responsibility test would be effective prospectively,[6] and remanded the case for a determination of whether there was a substantial possibility that Brawner's insanity defense would have succeeded under our altered standard. Consistent with this procedure, the Brawner court specifically rejected the approach of the Second Circuit in United States v. Tarrago,[7] in which that court applied its adoption of the ALI standard retroactively to automatically reverse cases in the appellate pipeline.

Similarly, in Gaither v. United States,[8] this court adopted a rule requiring the approval by twelve grand jurors of the actual indictment returned, noting that all indictments brought after the date of the decision not in conformity

---

1. United States v. Brawner, No. 22,714, 153 U.S.App.D.C. ——, 471 F.2d 969 (D.C. Cir. June 23, 1972).

2. United States v. Wilson, 153 U.S.App. D.C. ——, 471 F.2d 1072 (1972); see United States v. Bryant & Murdock, —— U.S.App.D.C. ——, 471 F.2d 1040 (1972).

3. Brawner, at —— – ——, —— of 153 U.S. App.D.C., at 978–979, 983 of 471 F.2d; Brawner, at ——, at 1023 of 471 F.2d (separate opinion).

4. The Brawner Court also suggested as a reason for its decision a desire for uniformity of expression among the Circuits. Brawner, at 969, at 984–985 of 471 F.2d. This is clearly a cosmetic and not substantive purpose.

5. While the expert witnesses' testimony was not phrased in terms of "product", the inference to the jury was nonetheless

clear that, as in Brawner, "causality was the cutting edge of the responsibility test and . . . at least some of the experts were convinced that causalty did not exist in this case." Brawner at 969, at 1035 of 471 F.2d (separate opinion); see Tr. 441, 470.

6. Brawner, at 969, at 1005 of 471 F.2d.

7. 398 F.2d 621 (2d Cir. 1968) (en banc). Three other circuits have applied their adoption of the ALI criminal responsibility standards with similar retrospective effect. Wade v. United States, 426 F.2d 64 (9th Cir. 1970) (en banc); Blake v. United States, 407 F.2d 908 (5th Cir. 1969) (en banc); United States v. Smith, 404 F.2d 720 (6th Cir. 1968).

8. 134 U.S.App.D.C. 154, 413 F.2d 1061 (1969).

with this rule would automatically be dismissed without further inquiry. The court refused to apply this rule retroactively to automatically dismiss indictments returned prior to the announcement of its decision, but, at least initially, did give the litigants before it "an opportunity to achieve dismissal of their indictments on a showing of a reasonable possibility" of prejudice. Recognizing that there was an injustice in affording this remedy to the appellants but not to those similarly situated, the *Gaither* court extended its availability. The court observed that

> . . . such injustice in case of need is amply authorized by Supreme Court precedent, . . . [but] it seemed to us better avoided if another solution could be found.[9]

On petition for rehearing, the court modified the application of its decision because of circumstances not relevant in the *Brawner* remand context.[10]

The *Brawner* court never directly addressed itself to the question of whether the limited-purpose remand afforded Brawner should be extended to litigants whose convictions were on appeal when *Brawner* was decided. Nor did it consider the possibility of "another solution". I would find such a solution in giving the *Brawner* remand procedure "normal judicial operation".[11] I would make the remand available to all pending appeals that patently present the same danger of distortion that led us to our reformulation of *Durham*.[12] I cannot assume that the Court ruled out every alternative solution without addressing the

9. 413 F.2d at 1081.

10. On petition for rehearing in Gaither v. United States, 134 U.S.App.D.C. 154, 413 F.2d 1061, 1081 (1969), the court abandoned its initial approach to the retrospectivity of its decision (described above, at notes 8–9, *supra*, and accompanying text). Although the Court had not been deterred from its earlier decision by the knowledge that up to 1100 hearings could have resulted, it was not then aware of additional problems created by the need for Grand Jury transcripts in each such hearing. Because of the bottleneck in producing those transcripts, even the court's limited retrospective application would have resulted in "serious disruption of the District Court calendar" and "serious delays in trials in the District Court." Since its original approach to retrospectivity threatened such an intolerable burden on the administration of criminal justice, the Court, with obvious reluctance, eliminated all retrospective application for its decision. There is no indication of any such intolerable burden being generated by the limited application of the *Brawner* remand suggested herein. *See* 413 F.2d at 1083–1084.

11. Mishkin, The Supreme Court 1964 Term—Forward: The High Court, The Great Writ, and the Due Process of Time and Law, 79 Harv.L.Rev. 56, 77 (1965); *see* Linkletter v. Walker, 381 U.S. 618, 627, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).

"Retrospectivity" would be an inappropriate description for the limited application suggested here. In a similar context, the Supreme Court explicitly defined "retrospective" application as giving a decision retroactivity *beyond* "cases still pending on direct review at the time [the decision] was rendered." Linkletter v. Walker, 381 U.S. 618, 621–622, 85 S.Ct. 1731, 1734, 14 L.Ed.2d 601 (1965); *Cf.* Williams v. United States, 401 U.S. 646, 652 n. 4, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971).

12. The majority in this case does not rely exclusively on the *Brawner* prospectivity language but also asserts, "we see no reason to believe that the jury would have reached a different result if instructed according to the formula prescribed in Brawner's case." Majority, at —— of 153 U.S.App.D.C. at 1053 of 471 F.2d.

Such a conclusion, particularly in a case where conclusory expert testimony is so obvious on the record, clearly seems foreclosed by our conclusion in *Brawner* that it is not appropriate for this court "to determine at this juncture whether a jury which convicted under our old insanity standard might have acquitted under the new standard. . . . [W]e are remanding to the trial judge . . . rather than considering that question at the appellate level in the first instance, because the trial judge has a superior vantage point for assessing whether there is a substantial possibility that the jury, if instructed under our new rule, would have found that appellant should be acquitted by reason of insanity." *Brawner* at —— of 153 U.S.App.D.C., at 1005 of 471 F.2d.

issue or suggesting any need—recognized by current case-law—which would support absolute prospectivity.[13]

My position is entirely consistent not only with the "sound principles of Stovall v. Denno",[14] but also with this court's express rejection of the kind of retrospectivity suggested by *Tarrago*. In *Stovall* the Supreme Court set out a three part test to determine what retrospective application its decision would be given: (1) the purpose of its new rule, (2) the extent of reliance by law enforcement authorities on the former law, and (3) the effect on the administration of justice of the proposed retrospectivity.[15]

In *Stovall*, as in those other cases where the Supreme Court's decisions have been given completely prospective effect, a "major change in the law was announced, overruling settled precedent."[16] The *Brawner* court, however, characterizes its decision as "not . . . a change in substantive law from outmoded doctrine . . . [but meant merely to] be helpful to the jury [although not] . . . indispensable to integrity in the fact-finding process."[17] *Brawner* was not meant to effect a substantive change in the responsibility defense but only to alter its formulation in order to prevent the misuse of expert testimony.[18]

This court long ago recognized the danger of expert oversteering[19] and *Brawner* is but another attempt to deal with it. The effect of Brawner's remand is merely to give him an opportunity to show a substantial possibility that his insanity defense had been rejected because of the distorting effect of improper expert testimony. The court has found it unnecessary, given its limited purpose in *Brawner*, to reverse any conviction absent some showing that this purpose had been contravened. To automatically reverse convictions rendered under the superseded standard might, as in *Stovall*, overturn many convictions unnecessarily.[20] This reasoning may have prompted our rejection of the *Tarrago* example. But remanding only those cases in which the very danger sought to be avoided in *Brawner* is patent on the record would clearly not be so overly broad an application of our decision.

Even while giving completely prospective effect to the prophylactic rule it was adopting in *Stovall*, the Supreme Court left open the possibility of reversal on a showing that the very unfairness meant to be prevented had occurred so

---

13. While there is precedent for adopting a new standard with only prospective effect *in case of need*, due to the burden on the administration of justice of any retrospectivity or because of the pattern of justifiable reliance of law enforcement authorities on the former standard, no such need has been demonstrated to justify refusing the limited retrospective application suggested here. *See* notes 20–24, *infra*, and accompanying text; *Cf.* Gaither v. United States, 134 U.S.App. D.C. 154, 413 F.2d 1061, 1082–1083 (1969).

14. 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed. 2d 1199 (1967).

15. 388 U.S. at 297, 87 S.Ct. 1967.

16. Gaither v. United States, 134 U.S.App. D.C. 154, 413 F.2d 1061, 1081 (1969).

17. *Brawner*, at —— – ——, 153 of U.S.App. D.C., at 1005 of 471 F.2d n. 79.

18. The *Brawner* court explained that "*Durham-MacDonald* is not significantly different in substantive content from the ALI test." While the court's announced purpose was to cope with the problem of expert "oversteering" posed by the *Durham* product formulation, its new standard "retain[s] the underlying concept of causal relationship." In sum, observes the court, its new rule was not adopted ". . . in the contemplation that it would affect a significant number of verdicts." *Brawner*, at ——, at 1005 of 471 F.2d n. 79.

19. Washington v. United States, 129 U.S. App.D.C. 29, 390 F.2d 444 (1967); *see* United States v. Brawner, No. 22,714, 153 U.S.App.D.C., at —— – ——, —— – ——, 471 F.2d, at 1017–1021, 1022–1023 (1972), (separate opinion).

20. 388 U.S. at 299, 87 S.Ct. 1967, 18 L.Ed.2d 1199.

as to deny the litigant due process.[21] Our reformulation of the insanity defense has a similar purpose regarding expert testimony. I merely suggest that we allow litigants like appellant an opportunity to show that the very distortion we meant to prevent by our *Brawner* decision had determined the verdict in their cases. This application is clearly so limited in scope as to be entirely consonant with the limited purpose of *Brawner*.

There is no "reliance by law enforcement authorities"[22] on the *Durham* formulation and *Brawner* does not, like *Stovall*, render inadmissable evidence secured by the police and used by prosecutors in reliance on prior judicial approval.

Finally, the *Brawner* Court stated that one of its reasons for rejecting the retrospective application of *Tarrago* was that such retrospectivity would impose a substantially greater "burden on [the] administration of justice"[23] for this Circuit than it did for the Second Circuit. But the *Brawner* court also observed that "if there is a case where there would be a difference in result [under the new standard] . . . [and hence a need to hold a new trial] it would seem rare . . . ."[24] Accordingly, there could be no intolerable "burden on the administration of criminal justice."

If, as the *Brawner* court suggests, our new formulation will improve the adjudication of the insanity defense by minimizing the domination by experts, then I believe that appellant should have an opportunity to benefit from that fairer adjudication, at least to the extent Brawner did. I would therefore remand this case to the trial court to determine whether there is a substantial possibility that appellant's insanity defense would have succeeded under our new formulation.

---

21. *Id.*

22. 388 U.S. 299–300, 87 S.Ct. 1967, 18 L.Ed.2d 1199; *see* United States v. Tarrago, 398 F.2d 621, 624 (2d Cir. 1968) (en banc).

23. *Brawner*, at —— of 153 U.S.App. D.C., at 1005 of 471 F.2d n. 79.

24. *Brawner*, at ——, at 990 of 471 F.2d; *accord, id.* at —— – ——, at 1005 of 471 F.2d n. 79.